AMERICAN LIVESTOCK & LOAN CO., RESPONDENT, *v.*
GREAT NORTHERN RY. CO., APPELLANT.

(No. 3,332.)

(Submitted January 13, 1914.   Decided February 11, 1914.)

[138 Pac. 1102.]

*Pleading and Proof—Variance—When Fatal—Parties—Joint
and Several Causes of Action—Technicalities.*

Variance—When Immaterial—When Fatal.
   1.  Mere divergencies in detail in the proof from the allegation of a pleading are immaterial (Rev. Codes, sec. 6585); where, however, one contract is pleaded and another one is proved, or where the complaint alleges one breach of duty and the evidence establishes a different one, the variance amounts to a failure of proof (sec. 6587), justifying a nonsuit.
   [As to reversal of judgment for technical violation of rule that allegations and proof must agree, see note in Ann. Cas. 1913D, 68. As to right of appellate court to reverse judgment *sua sponte*, for variance, see note in Ann. Cas. 1914A, 468.]

Same—Joint and Several Causes of Action.
   2.  Under the rule that neither in actions *ex contractu* nor in actions *ex delicto* can the plea of an obligation to the plaintiff individually be sustained by proof of an obligation running to himself and others jointly, *held*, in an action by a cattle owner against a railroad company based upon a complaint counting on the failure of the carrier to supply cars on a given day for the shipment of plaintiff's cattle, that there was a fatal variance between his pleading and the evidence, which showed that the obligation to furnish cars ran to a combination of cattle owners, of which plaintiff was one, and not to him individually.

Causes of Action—Joint and Several.
   3.  An obligation running to a combination of persons jointly could not be changed into one actionable by any member of it, by the fact that defendant's agent knew from previous transactions that plaintiff was a member of the combination, and that failure to perform would result in damage to the latter.

Variance—Technicalities.
   4.  While matters of mere technicality are not looked upon with favor by the supreme court, the contention that because the rule requiring

the pleadings and proof to correspond is, in a measure, technical and formal, it should be disregarded, has no merit, since its abrogation would not make for simplicity and justice, but result in confusion, delay and often in a denial of justice.

*Appeal from District Court, Valley County; Frank N. Utter, Judge.*

Action by the American Livestock & Loan Company against the Great Northern Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded, with directions to dismiss complaint.

*Messrs. Veazey & Veazey,* for Appellant, submitted a brief; *Mr. I. Parker Veazey, Jr.,* argued the cause orally.

It is a general rule of pleading, whether an action is based on an express written contract, or upon a contract implied in fact, or upon a contract implied in law or upon any obligation created by law or by act of the parties or otherwise, that the terms of that contract or obligation must be correctly stated or there will be a variance. The complaint, in stating the terms of the contract or obligation, must show the right of the plaintiff to sue upon it. So, also, the proof must sustain these allegations of the complaint as to the right of plaintiff to sue upon the obligations. Thus in 31 Cyc. 707, is found the following statement of the general principle: "The proof must show the same parties to the contract, decree, deed, transaction, or proceeding as are alleged in the pleadings." Again on page 705 of the same work: "Every averment which the pleadings make material as a descriptive part of a cause of action must be proved as alleged and any variance which destroys the legal identity of the matter or thing averred with the matter or thing proved is fatal."

So also in 9 Cyc. 756, we find the following: "A joint contract cannot be given in evidence where a several contract is alleged." Therefore, it is immaterial whether the action is treated as an action upon a contract express or implied, or as an action upon a duty or obligation imposed by law upon a

common carrier.   In any event, it is incumbent upon the plain-
tiff to state facts showing what the duty or obligation, con-
tractual or otherwise, was, and that plaintiff had a right to
assert a breach of that obligation or duty.   The proof, in this
case, however, shows no violation of duty to plaintiff, but, if
to anyone, a violation of a duty to the Helena Pool, which alone
had the right to control the disposition of the cars ordered by
it.   The proof did not show the same duty, obligation, ''con-
tract, transaction or proceeding as is alleged in the pleadings.''
Or to express the matter in the language of another portion of
the text above, ''the legal identity of the matter or thing
averred with the matter or thing proved was destroyed.''   The
issue has really been decided by this court of this state in the
case of *Wahle* v. *Great Northern Ry. Co.*, 41 Mont. 326, at 332,
109 Pac. 713.

*Messrs. Stiles & Devaney,* and *Mr. Thomas Dignan,* for Re-
spondent, submitted a brief; *Mr. Chester L. Nichols,* of Counsel,
argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Among the issues tendered by the complaint and joined by
the answer are these: ''That on or about the 17th day of Sep-
tember, 1910, plaintiff, being the owner and in possession of
140 head of fat beef cattle, then located and grazing in the
vicinity of Malta, Montana, notified and informed the defend-
ant of that fact, and that it desired and intended to ship said
cattle to the Union Stock Yards, Chicago, Illinois, over the line
of the defendant and succeeding connecting common carriers
for sale upon the market at that point, and  *  *  *  re-
quested and directed the said defendant as such common car-
rier to provide and furnish for the loading, shipment and
transportation of said cattle from its said station of Malta,
Montana, on September 30th, 1910, a sufficient number of suit-
able stock-cars for the loading and transportation of said cattle
to said destination,'' and all of which the defendant, on or about
said September 17, 1910, promised and agreed to do.   ''That

on said September 30, 1910, the said plaintiff tendered said 140 head of cattle to the defendant as such common carrier at said station of Malta for shipment and transportation over its said line of railway and connecting lines to said Union Stock Yards, Chicago, Illinois, and requested the defendant as such common carrier to receive and accept the same for such transportation and delivery, and also requested the said defendant as such common carrier to provide, furnish and set at its said station of Malta, Montana, for the use of plaintiff, sufficient reasonably suitable cars to be loaded with said 140 head of cattle for shipment and transportation as aforesaid, and that thereafter daily and on October 1st and 2d, 1910, the said plaintiff repeated and reiterated its said tender of said cattle to the defendant at said Malta, and its offer to load and ship the same over its said line of railway and connecting lines to said Chicago, and also repeated and reiterated its said demand upon the defendant for cars into which to load its said cattle for transportation to said destination as aforesaid, but that the defendant wrongfully and negligently failed, neglected and refused to furnish or provide said cars for the use of said plaintiff as aforesaid, and wrongfully and negligently failed, neglected and refused to receive or accept said cattle as such common carrier or at all, for shipment or transportation to said Chicago, or elsewhere, or at all, until Monday October 3d, 1910.''

To maintain these issues the respondent presented evidence to the following effect: In the year 1910 the ''Helena Pool'' was a combination of individual cattle owners, including the respondent, who, for economic reasons, ran, gathered and brought their cattle to the shipping point as one concern. It employed a single foreman, Mr. Jaycox, and it spoke through a single manager, Mr. L. E. Kaufman. When the cattle were brought to the shipping point, the customary procedure was to cut out and load them according to ownership, and they were then transported under several contracts in the name of the individual owners. Such a proceeding had been completed on

September 17, 1910, when Mr. Kaufman appeared before the agent of the appellant company at Malta and said: "I am ready to give you the next order; I want forty-two 44-foot cars for the same people what shipped out now, for the same members; I want them for the 30th of this month, Friday the 30th. You can put it down again the same as before 'Helena Pool, by me.'" The agent answered: "All right, we will see that they are here." Nothing was said at that time about the number of cattle to be shipped, either as a whole or according to ownership, because it was not then definitely known. On September 29th, Mr. Jaycox having gathered and brought to within eight miles of Malta about 1,000 head of beef cattle belonging to the members of the pool, Mr. Kaufman again appeared before the agent, informed the agent of the arrival of the cattle, that 1,000 head were to be shipped under the order placed on September 17th, and that "we are ready to load out to-morrow morning." The agent said: "We can do nothing for you; no cars here." "I told him," says Kaufman, "that we were here with our cattle, and that we must have the cars, and he says, 'Do you need all those cars what you ordered?' I says, 'Yes, we know how many we got, each outfit. We got 18 cars for the Conrad-Price Cattle Company, and we have 6 cars for Pruett & Phelps, and we have 6 cars for the Empire, and we have about 6 cars for the American, 3 for the pool and 3 for Stadler & Kaufman. That makes just the amount what I ordered, 42 cars.'" There were no stock-cars at Malta on that day or the next day; but Kaufman saw the agent again on Friday the 30th, and told the agent "to try to get the cars for Saturday if he could not get them for Friday; that we must have cars, as our cattle was out here and have no feed and bad water, and the cattle fall off every hour of the day. * * * I did not demand forty-two 44-foot stock-cars, but we demanded cars enough to ship our cattle. * * * Such information as I gave the agent in regard to the number of cattle out there, the owners and the condition of the range was given to impress him with the necessity of his complying with the order of Sep-

tember 17th. That was the only purpose of advising him as to the number of cattle or as to the owners. * * * He said he would try to do what he could for us for Saturday. I talked with him again on Saturday about getting the cars for us. * * * As before, I demanded that he furnish us cars; I told him it would take forty-two 44-foot cars or at least 55 small cars. * * * I told him rather than to hold our cattle until the following week we would take a chance if they can get us the cars for Sunday. He says: 'I will try, and wire up to headquarters and see whether they can furnish you any cars for Sunday.' '' No stock-cars appeared at Malta during Saturday or Sunday morning, and on Sunday morning the agent told Mr. Kaufman that no word had come from Havre. A little after noon on Sunday Mr. Kaufman again saw the agent, who said: ''I have got an answer; we can furnish you 18 small cars.'' But it was then too late to get the cattle in, cut out enough belonging to any particular owners to fill eighteen cars, and load them out on that day. To ship Monday would bring the cattle to Chicago on the following Saturday, on which day of the week there is little, if any, market for western stock; and to ship Tuesday would bring the cattle to Chicago on the following Sunday, on which day of the week there is no market at all. The shipment was therefore deferred to Wednesday, but in the meantime forty head were turned back, because they were ''gaunted and showed the hard usage.'' As finally made on Wednesday, October 5th, the shipment was in one train of forty-two cars—twenty-three 44-foot cars, three 36-foot cars, and sixteen 33-foot cars—billed out ''under separate individual livestock contracts, then and there executed by the agent, Schilling, for the defendant railway company, and by the witness Kaufman as agent on behalf of each of said shippers.'' As so billed, the train contained three cars of cattle for Stadler & Kaufman, six for the Empire Cattle Company, sixteen for the Conrad-Price Company, six for Pruett & Phelps, four for the Helena Pool, and seven cars containing 140 head for the respondent on this appeal.

At the close of the evidence on behalf of the respondent, the appellant moved for a nonsuit upon several grounds, among them being "a fatal variance amounting to a failure of proof" in that the complaint alleges, and the action was brought to recover for, the failure of the railway company to comply with an order placed September 17th by the respondent for a sufficient number of stock-cars for the shipment of its 140 head of beef cattle on September 30th, whereas the evidence discloses no such order, but an obligation which, whether viewed as arising from contract or from the duty of the appellant as a common carrier, ran not to the respondent, but to a combination known as the "Helena Pool," and which obligation was not to furnish sufficient cars to ship a definite number of cattle belonging to the respondent, but to furnish forty-two 44-foot cars for the shipment of the stock of the pool. It was urged in support of the motion that the variance is prejudicial in point of fact, in that the appellant is subjected to several suits to recover damages upon a single cause of action, is denied its right to have the matter adjudicated by the federal court, and is prevented from asserting a counterclaim for the ordering of excess cars. The motion was denied, and upon the correctness of that ruling all the assignments of error primarily depend.

Under our statute, no variance of the proof from the allegations of a pleading is to be deemed material, unless it has [1] actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits (Rev. Codes, sec. 6585) ; and no such variance amounts to a failure of proof unless the allegations of the claim or defense stand unproved, not in some particular or particulars only, but in its general scope and meaning. (Rev. Codes, sec. 6587.) The language of these provisions is clear, and they are designed, on the one hand, to insure to the defendant full notification of what he shall be called upon to meet, and, on the other, to require that he shall meet it without regard to unsubstantial departures. Such, in effect, has been the construction of these statutes by

this court in the cases where the variance has been held material and fatal, and in the cases where it has not. In accordance with this construction, we have said that, where one contract is pleaded and another one is proved, or where the complaint alleges one breach of duty, and the evidence establishes a different one, the variance amounts to a failure of proof, upon the occurrence of which a nonsuit is proper. (*McCrimmon* v. *Murray,* 43 Mont. 457, 117 Pac. 73; *Knuckey* v. *Butte Electric Ry. Co.,* 41 Mont. 314, 109 Pac. 979; *Flaherty* v. *Butte Electric Ry. Co.,* 40 Mont. 454, 135 Am. St. Rep. 630, 107 Pac. 416; *Forsell* v. *Pittsburgh etc. Copper Co.,* 38 Mont. 403, 100 Pac. 218; *Spellman* v. *Rhode,* 33 Mont. 21, 81 Pac. 395; *Kalispell Liquor Co.* v. *McGovern,* 33 Mont. 394, 84 Pac. 709; *Childs* v. *Ptomey,* 17 Mont. 502, 43 Pac. 714; *Gilliam* v. *Black,* 16 Mont. 217, 40 Pac. 303.) These decisions have their counterpart in others which enforce the rule that mere divergencies in detail are not of vital consequence. (*Mosher* v. *Sutton's New Theater Co., ante,* p. 137, 137 Pac. 534; *Previsich* v. *Butte Electric Ry. Co.,* 47 Mont. 170, 131 Pac. 25; *Robinson* v. *Helena L. & Ry. Co.,* 38 Mont. 222, 239, 99 Pac. 837.)

The question, then, is whether the evidence presented by the respondent sustained the cause of action pleaded in the complaint. The case was tried in the district court upon the theory that the order for cars placed on September 17th did not give rise to a contractual relation, and that the appellant's liability, if any, arises from its duty as a common carrier to furnish cars upon reasonable notice. While there is abundant authority for the conclusion that, under the evidence presented by the respondent, a contractual relation was created (*Clark* v. *Ulster & Del. R. R. Co.,* 189 N. Y. 93, 121 Am. St. Rep. 848, 12 Ann. Cas. 883, and note at page 885, 13 L. R. A. (n. s.) 164, 81 N. E. 766), the question is unimportant, because error is not predicated upon the theory adopted, and because the essentials and consequences of a variance are not affected thereby.

In this case the order for cars was placed in the name of the Helena Pool, by the manager of the Helena Pool, for a definite

number of cars estimated by him as sufficient to meet the needs of the Helena Pool. At no stage of the transaction did the respondent present or seek to assert its individuality; it tendered no cattle, it demanded no cars, it made no complaint. At no time could the appellant have made any effective offer of cars to the respondent or demand that the respondent ship its cattle without regard to the other members of the pool. The purpose for which the cars were to be furnished is described by all the witnesses as "a shipment" of cattle by the Helena Pool. That the obligation imposed upon appellant by the order of September 17th was to the Helena Pool, and not to the respondent cannot, we think, be doubted. Now, neither in actions *ex contractu* nor in actions *ex delicio* can the plea of an obligation to the plaintiff individually be sustained by the proof of an obligation running to himself and others jointly, for the reason that, to maintain a joint obligation, all the obligees must be parties to the action. This was the rule at common law (*Farni* v. *Tesson*, 1 Black (U. S.), 309, 17 L. Ed. 67; Pomeroy's Code Remedies, secs. 184–189); it is still the rule under the Codes (Rev. Codes, sec. 6491; *Montana Mining Co.* v. *St. Louis, M. & M. Co.*, 19 Mont. 313, 48 Pac. 305; Pomeroy's Code Remedies, sec. 197; Sutherland on Code Pleading, secs. 18, 19; Bliss on Code Pleading, secs. 63–65), and its justification may be found in the almost universal conviction that the multiplication of suits over a single cause of action is contrary to sound public policy.

The rule just stated has reference, of course, only to those obligations in which the legal interest is joint, and by "legal [3] interest" is meant, not the interest which may be had in the sum of money or other benefit to accrue upon the performance of the obligation, but "the legal, technical interest" created by the obligation itself; hence the converse of the foregoing is that, though an obligation be joint by its terms, each obligee may nevertheless maintain an action upon it, if, in fact, the legal interest is several, as where specific sums or benefits are made to inure to the obligees in severalty. The argument

of respondent rather vaguely suggests that the obligation at bar is of the character last described; but the very most to be said from respondent's point of view is that from previous transactions the appellant's agent knew respondent as a member of the pool, knew that the shipment, when made, would include an unknown number of respondent's cattle, which would be billed in its name, and knew, or should have known, that failure to furnish the cars ordered might result in some damage to the respondent. That these circumstances unaided could not change an obligation which by its terms ran to the respondent and others jointly into one actionable by the respondent alone is clear from the authorities cited above, as well as from the following additional ones: *Florence* v. *Helms,* 136 Cal. 613, 69 Pac. 429; *Graves* v. *Boston etc. Ins. Co.,* 2 Cranch (U. S.), 419, 2 L. Ed. 324; *Ford* v. *Bronaugh,* 11 B. Mon. (Ky.) 14; *Stearns* v. *Martin,* 4 Cal. 227; *Titus* v. *Railroad Co.,* 5 Phila. (Pa.) 360; *Simpkins* v. *Montgomery,* 1 Nott & McC. (S. C.) 589; *Gray* v. *Johnson,* 14 N. H. 414; *Snell* v. *De Land,* 43 Ill. 323; *Rorabacher* v. *Lee,* 16 Mich. 168; *Bradley's Executor* v. *Maull,* 4 Har. (Del.) 223; *Richey* v. *Branson,* 33 Mo. App. 418; *Davis* v. *Wannamaker,* 2 Colo. 637; *Curry* v. *Kansas etc. Ry. Co.,* 58 Kan. 6, 48 Pac. 579; *Holyoke* v. *Loud,* 69 Me. 59; *McIntosh* v. *Zaring* (Ind. Sup.), 38 N. E. 321; *Wright* v. *Gilbert,* 51 Md. 146; *McCord* v. *Seale,* 56 Cal. 262.

The complaint is made in respondent's brief that the proposition involved in this appeal is technical. While we have repeatedly said that matters of mere technicality will receive scant consideration in this court, it surely is not a valid objection to a matter of substance that it is also technical and formal. The complaint in a civil action is a matter of form, but it is so far from being a mere matter of form that no defense can be aptly presented, no testimony be intelligently taken, and no judgment be responsively entered so as to protect the public from endless litigation, without a complaint stating with substantial accuracy the matters upon which relief is claimed; and to abrogate the rule requiring the pleadings and proof to cor-

respond would not make for simplicity and justice, but for confusion, for delay, and for the denial of justice in many cases.

In view of the foregoing, the questions suggested by the other assignments of error become wholly academic, and need not be considered.

The judgment appealed from must be reversed and the cause remanded, with directions to dismiss the complaint. It is so ordered.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.