ULMEN, Respondent, *v.* SCHWIEGER et al., Appellants.

(No. 6,879.)

(Submitted February 15, 1932. Decided March 30, 1932. Amended Opinion May 7, 1932. Opinion on Motion for Rehearing Filed July 8, 1932.)

[12 Pac. (2d) 856.]

*Messrs. Brown, Wiggenhorn & Davis* and *Mr. Roy F. Allan,* for Appellant R. A. Schwieger, submitted an original and **a** reply brief; *Mr. Horace S. Davis* argued the cause orally.

*Messrs. Wood & Cooke*, for Appellant W. P. Roscoe, submitted a brief; *Mr. Sterling M. Wood* argued the cause orally.

338

*Mr. Lowndes Maury, Mr. Thomas M. Murn* and *Mr. P. F. Leonard,* for Respondent, submitted an original and a supplemental brief; *Mr. Maury* and *Mr. Leonard* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an action for damages for personal injuries. The jury found for plaintiff, and assessed his damages in the sum

of $10,000. From the judgment entered on the verdict, the defendants separately appealed.

The evidence on some features of the case was conflicting, but the jury was warranted in finding the following salient facts: That on September 2, 1928, plaintiff, traveling by automobile, was taking his sister, Loretta, from Ray, North Dakota, to Miles City, Montana, where she had accepted a position as teacher in the high school. Plaintiff drove the car, an Essex coach, as far as Sidney, and then his sister, an experienced driver, did the driving until the plaintiff was injured. At a point about one mile west of Fallon, at about sunset, the car was driven into an open excavation and against a concrete culvert which had been constructed across what the plaintiff and his sister supposed was the regularly established and used highway. The top of the culvert was about a foot lower than the top of the highway, and between the top of the highway and the culvert was a sheer drop or pit; the hole and culvert were not discovered by the occupants of the car until the car was within twenty or thirty feet of the hole; efforts to stop the car before running into the hole were unavailing. The impact caused serious injuries to plaintiff. The car was being driven about twenty-five to thirty miles per hour before the occupants observed the pit and culvert. The road on both sides of the culvert had been graded and smoothed over up to the edge of the pit in which the culvert was erected, and, on approaching the culvert from the east, the road presented the appearance of being well traveled; there were no signals, signs or barricades at the culvert. The pit or hole was five or six feet deep, extending across the full width of the highway. The highway was a part of the state highway known as federal aid project 130–C, from Fallon to Terry, which was in process of construction during the year 1928; the contract for its construction was let by the state highway commission to defendant Schwieger in the spring of 1928. Paragraph 40 of the contract provided: "The Contractor shall provide, erect and maintain all necessary barricades, suitable and sufficient red lights, warning and danger

signals, provide a sufficient number of watchmen and take all necessary precautions for the protection of the work and safety of the public. The Commission will provide and the Contractor shall erect and maintain acceptable and adequate detour signs at all closures and along the detour routes. All barricades and obstructions shall be illuminated at night, and all lights shall be kept burning from sunset until sunrise.''

Formerly the road at a point about one-half a mile west of Fallon turned south across the railroad tracks, and then paralleled the tracks on the south; the new road was built on the old road until it reached the point where the old road turned south to cross the railroad tracks, and the new road, instead of turning south, continued due west, paralleling the railroad tracks on the north. The culvert was about 2,100 feet west of the point where the old road turned south to cross the railroad tracks. Defendant Schwieger did not himself perform the work under his contract with the state highway commission, but sublet the grade work to Herbert Adams and the concrete work to defendant Roscoe. Adams was an independent contractor. Roscoe agreed to build the culvert in accordance with the plans and specifications of the contract between Schwieger and the highway commission. The grading of the road had been completed about the last of July or the first of August. Defendant Roscoe started constructing the culvert about August 22; it was completed on August 31, but the dirt had not been filled in, due to the fact that it takes the concrete about twenty or twenty-one days to dry; Adams was chargeable with the duty of filling in the dirt beside the culvert. The concrete work had not been accepted by either the defendant Schwieger or by the highway commission on September 2; in fact, the grading had not been accepted by the highway commission.

Mr. Woodward, engineer for the highway commission, testified: ''I don't know when this was accepted. Well, it was some time after the whole job was done; they don't accept any portion of the work at all; they accept the whole job complete. It is all accepted together. In fact, this work is

the work of the respective contractor until the highway commission accepts it.''

The old road, turning south to cross the railroad tracks, was the regularly used highway known as the Yellowstone and National Parks highway, and was still in use as such on September 2, and was the only road at that time and place that had formally been dedicated and opened for public use. There was a sharp drop of about four feet from the grade to the old road as it turned to cross the railway tracks, and it was not readily observable by one traveling the graded road without the aid of detour or other signs. For the sake of convenience only we shall hereafter refer to the old road turning off the grade as the ''detour.'' The evidence was in sharp conflict as to whether there was an adequate detour sign or barricade at the point of the detour to advise travelers not to travel the new road.

In behalf of plaintiff, witnesses testified that, on many occasions prior to the time plaintiff sustained the injuries complained of, there were no detour signs or any barricade at the point of the detour, and that before as well as after the culvert was constructed many automobiles traveled, or attempted to travel, the new road, without any warning not to do so. Witnesses for defendants testified that a barricade was constructed at the point of the detour consisting of a telephone pole about sixteen feet long, placed across the road, with a fence post or tie under one end, raising the end about six inches off the ground; that to the pole was attached, first by nails, and later by wire, a ''Road Closed'' sign; that on the north end of the pole there was sufficient space to allow traffic to pass on the grade, but this was at times obstructed by a fence post laid across it, with one end against the north end of the telephone pole.

There was also a conflict in the evidence as to whether there was any barricade at the point of the detour on September 2 and prior thereto. The evidence is without dispute, however, that the barricade was found lying in the ditch off the grade at about 8 P. M. on September 2. And plaintiff's evi-

dence was to the effect that there was no barricade at the time he traveled the new road to the culvert. From this conflicting evidence we must assume, since the jury found for plaintiff, that it found those chargeable with the duty of so doing did not discharge their duty to erect and maintain adequate barricades and detour signs to warn the traveling public.

Defendant Schwieger insists that, since he sublet all the work in connection with the construction of the highway to independent contractors, he cannot be held liable for the injuries to plaintiff.

The general rule is that an employer is not liable for the wrongful or negligent acts of an independent contractor. To this general rule there are well-recognized exceptions. One exception is where the work to be done is intrinsically dangerous or hazardous. This exception was pointed out in *Shope* v. *City of Billings*, 85 Mont. 302, 278 Pac. 826.

Judge Dillon, in his work on Municipal Corporations, fifth edition, section 1723, states the exception to the rule as follows: "Accordingly, the later and better considered cases in this country respecting streets have firmly and, in our judgment, reasonably, established the doctrine that, where the work contracted for necessarily constitutes an obstruction or defect in the street, of such a nature as to render it unsafe or dangerous for the purposes of public travel, unless properly guarded or protected, the employer (equally with the contractor), where the injury results directly from the acts which the contractor engaged to perform, is liable therefor to the injured party." (See, also, 39 C. J., 1335, and 14 R. C. L. 97.) The exception was given recognition in *Cameron Mill & Elevator Co.* v. *Anderson*, 98 Tex. 156, 1 L. R. A. (n. s.) 198, 81 S. W. 282; *Thomas* v. *Saulsbury & Co.*, 212 Ala. 245, 102 South. 115; *Montgomery* v. *Garza*, (Tex. Civ. App.) 290 S. W. 210; *Wilkey* v. *Rouse Construction Co.*, 224 Mo. App. 495, 28 S. W. (2d) 674, and other cases.

But defendant Schwieger contends that the exception to the general rule applies to cases only where the work contem-

plated by the contract has to do with obstructions or excavations in an existing highway, in use as such, and not to a case, as here, where the work contemplated was that of constructing a new highway where none existed before. Circumstances presented here make the exception applicable. The work contemplated by the contract between the highway commission and Schwieger was not altogether that of constructing a new highway where none existed before. For about half a mile west from the town of Fallon the work embraced in the federal aid project No. 130–C, which was awarded to defendant Schwieger, followed the course of the old highway; from the point where the old road turned south to cross the railroad tracks, the new road was but an extension of the old road already in use as the Yellowstone and National Parks highway. It should have been contemplated by the contracting parties that the work about to be done might give the road at the place where the injury occurred the appearance of safety and of being a finished, completed road before its actual formal acceptance as such by the highway commission, and before it was actually opened for use by the traveling public. It was actually contemplated by the contracting parties that the work involved danger to the traveling public.

To guard against the dangers occasioned by the work embraced in the contract, the contracting parties stipulated that the contractor, Schwieger, should erect the necessary barricades and "take all necessary precautions for the protection of the work and safety of the public," and to maintain adequate detour signs. The erection and maintenance of adequate barriers and detour signs to warn the traveling public was the very thing that would prevent the work from being intrinsically dangerous. Without the signs and barricades, the work was evidently regarded by the contracting parties as extremely dangerous. The duty to erect and maintain adequate signs and barricades could no more be delegated in a situation where, without them, the public would be misled into believing that the dangerous road was open for travel though not, in fact, formally opened for use, than in

a case where the road was actually open for travel. The contract between the parties, the nature of the work to be done, and its connection with the extensively traveled existing highway, all point to the conclusion that the work was in fact inherently dangerous and hazardous to the public, and known to be so by the contracting parties, unless properly guarded. (*McLean* v. *Crown Tailoring Co.*, 29 Ont. L. Rep. 455, 15 D. L. R. 353.) This being so, the duty devolving upon defendant Schwieger, and which he specifically agreed to perform, was one which could not be delegated to another so as to relieve him of responsibility for its nonperformance.

As much was held under facts very similar in *Hughes* v. *Robert G. Lassiter & Co.*, 193 N. C. 651, 137 S. E. 806, 809. In that case the statute made it the duty of the highway department, as well as the contractor, to maintain suitable detours. The contractor agreed to do so in the written contract with the highway department. The court in that case said: "Under a mandatory statute and their contract, defendants owed a duty to the public which it cannot shirk and cast on another." It also held that the life and limb "of one who travels through the state is equally protected as one who lives in the particular locality."

As stated, this duty was imposed upon the highway commission, as well as the contractor, in that case, by statute, but the rule is the same where the duty arises by common law. And "it arises at law in all cases where more or less danger to others is necessarily incident to the performance of the work let to contract. It is the danger to others incident to the performance of the work let to contract that raises the duty, and which the employer cannot shift from himself to another, so as to avoid liability, should injury result to another from negligence in doing the work." (*Covington & Cincinnati Bridge Co.* v. *Steinbrock*, 61 Ohio St. 215, 76 Am. St. Rep. 375, 55 N. E. 618, 619.) In that case, the court stated the general rule as follows: "The weight of reason and authority is to the effect that, where a party is under a duty to the public or third person to see that work he is about to

do, or have done, is carefully performed so as to avoid injury to others, he cannot, by letting it to a contractor, avoid his liability, in case it is negligently done to the injury of another.'' (And see 39 C. J. 1336, and cases.)

In *Bower* v. *Peate*, L. R. 1 Q. B. Div. 321, 326, it was said: ''That a man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise, unless means are adopted by which such consequences may be averted, is bound to see to the doing of that which is necessary to prevent mischief, and cannot relieve himself of his responsibility by employing some one else—whether it be the contractor employed to do the work from which the danger arises or some independent person—or to do what is necessary to prevent the act he has ordered done from becoming unlawful. * * * There is an obvious difference between committing work to a contractor to be executed, from which, if properly done, no injurious consequences can arise, and handing over the work to be done from which mischievous consequences will arise unless precautionary measures are adopted.'' (And see, to the same effect, *Wight* v. *H. G. Christman Co.*, 244 Minn. 208, 221 N. W. 14; *Blount* v. *Tow Fong*, 48 R. I. 453, 138 Atl. 52; Mechem on Agency, secs. 1873, 1918; note in 18 A. L. R. 801, 23 A. L. R. 984 and 25 A. L. R. 426.)

Another exception to the general rule, that an employer doing a piece of work through an independent contractor is not liable for the latter's negligence, is where the employer has assumed a specific duty by contract. In such a case he cannot evade liability by employing another to do that which he has agreed to perform. (*Atlanta & Florida R. Co.* v. *Kimberly*, 87 Ga. 161, 27 Am. St. Rep. 231, 13 S. E. 277; *St. Paul Water Co.* v. *Ware*, 18 Wall. 566, 21 L. Ed. 485; *Scott Construction Co.* v. *Cobb*, 86 Ind. App. 699, 159 N. E. 763.)

Defendant Schwieger also predicates error in overruling his objection to the introduction in evidence of paragraph 40 of the contract. He contends that the complaint contains no allegation of contractual negligence. The complaint alleges

that it is the nondelegable duty of defendant Schwieger to erect and maintain adequate detour signs, and to erect and maintain barricades, guides and signals. It sets forth that the work contracted to defendant Roscoe was inherently dangerous, unless done with caution as to placing warnings and lights, and as to providing detours. It then alleges: "That by reason of the said work and of the said duties assumed by said defendant Schwieger in his contract with said highway commission and because the said work, if not done with reasonable care, was and would be a most dangerous public nuisance, the said Schwieger was and remained equally liable with the said Roscoe for any detriment or injury to any of the public that might be caused by the negligent conduct of the said defendant Roscoe."

Were we to hold that the complaint, in spite of these allegations, did not plead contractual negligence, or negligence based upon failure to comply with a contractual obligation, still we hold that paragraph 40 of the contract was admissible in evidence.

Whether necessary or not, Schwieger's duty was alleged in the complaint. In the absence of a special demurrer or motion to make the complaint more definite and certain, plaintiff could under the complaint introduce whatever proof was available to show this duty as alleged, even though the duty might, in the absence of the contract, have likewise arisen as a matter of law. Paragraph 40 of the agreement was admissible to show Schwieger's duty as alleged. (*McMahon* v. *Second Ave. R. Co.*, 75 N. Y. 231.)

A similar contract was held a proper matter for consideration in *Rengstorf* v. *Winston Bros. Co.*, 167 Minn. 290, 208 N. W. 995, and in *Metcalf* v. *Mellen*, 57 Utah, 44, 192 Pac. 676.

It is also contended that the case should have been withdrawn from the jury because of plaintiff's contributory negligence. In brief, it is asserted that the negligence of the driver must be imputed to plaintiff, and that, since the car was driven into the hole and culvert, plaintiff's injuries

were produced by his own act, or the act of his sister imputable to him, and that the burden rested with him to submit proof that he was free from fault. Whether, if the driver was negligent, such negligence would be imputed to plaintiff need not here be determined. Under the facts here, the court properly submitted the case to the jury. There was no evidence of negligence on behalf of the driver. The car was within twenty or thirty feet of the hole or culvert before it was observed by the occupants of the car. The hole and culvert were not readily observable because the road on both sides was smooth up to the excavation in which the culvert was placed. The road appeared to have been well traveled. There being no detour sign or barricade of any kind to advise them that the road was not in fact open for travel, they had the right to act on appearances without becoming trespassers at the place where the injury occurred. The appearance of the graded road was one of safety, and led plaintiff and his sister to believe that it was a completed highway in regular use as such. They had no reason to suspect that there was a hole and culvert, characterized by one witness as a "death trap," on what appeared to them to be the highway.

It was likewise proper, for the reasons stated, to refuse defendants' offered instruction that the burden of proof rested with plaintiff to establish his freedom from contributory negligence.

Defendant Schwieger contends that the allegations of the complaint are insufficient to constitute a cause of action. The principal point relied upon in support of this contention is that it is not alleged that Schwieger failed to take proper precautions within a reasonable time after notice of the danger. As above stated, Schwieger had the positive duty of erecting and maintaining detours, signs and warnings. The acts of his subcontractors were his own acts. "Knowledge of the defect or danger is not a necessary element of negligence where the act or omission, in and of itself, involves a violation of a duty, * * * or where the negligent act or omission of the owner of the premises created the dangerous condi-

tion. * * * The notice of defect or danger which is necessary in order to impose liability for negligence need not be actual, for negligently remaining ignorant of that which it is one's duty to know. has the same effect as actual knowledge and in such case one is said to have implied or constructive notice. * * * The governing consideration is what the person sought to be charged should reasonably have foreseen, the rule being that one is bound to anticipate the reasonable and natural consequence of his own conduct. One is charged with knowledge or notice of what a reasonably prudent person would have foreseen, and is negligent if he fails to use the care necessary to avoid danger, which should have been anticipated." (45 C. J. 653–655. And see *Robinson* v. *F. W. Woolworth Co.*, 80 Mont. 431, 261 Pac. 253.)

The complaint was sufficient to state a cause of action.

Error is predicated on the court's refusal to give to the jury the following instruction: "You are instructed that if it appears from the evidence in this case that prior to the accident complained of, a barricade was installed on the new grade here involved which was sufficient to prevent a reasonably careful and prudent person from attempting to travel upon that grade, and that prior to the accident the said barricade had been removed wholly or partially by some person other than the defendants so that the said grade was left open to travel, then and in such event the plaintiff cannot recover in this action against the defendants, or either of them, in the absence of further proof that the fact of the removal, in whole or in part, of the said barricade was known by the defendants, or by one of them, in time to replace such barricade before the accident, and also that they, or the defendant having such notice, neglected thereafter to replace the same."

Defendant Schwieger would not be relieved of liability if Adams or his agents or servants removed the barricade, and the offered instruction was erroneous because it did not cover such a condition. In effect, it relieved defendants of liability, under the conditions specified in the offered instruction, if the barricade was removed by anyone but the defendants.

Other assignments of error by defendant Schwieger have been considered, but we find no cause for disturbing the verdict and judgment as to him.

---

ON MOTION FOR REHEARING.

Opinion: PER CURIAM.

In the opinion promulgated on March 30, 1932, the court, speaking through Mr. Justice Angstman, found the evidence insufficient to warrant a judgment against defendant Roscoe, and, as to him, the cause was reversed. The opinion was agreed to by all the Justices. The defendant Schwieger and plaintiff severally moved for a rehearing. Upon consideration thereof the motion was denied as to defendant Schwieger, and the opinion, as to him, was left undisturbed. Upon consideration of plaintiff's motion and a review of the evidence, the court unanimously decided that its original opinion as to defendant Roscoe was wrong, and, speaking through Mr. Justice Angstman, amended the opinion, affirming the judgment as to defendant Roscoe as well as defendant Schwieger. Plaintiff's motion for rehearing was denied *pro forma*. The opinion as amended was filed May 7, 1932. In due time thereafter, defendant Roscoe moved for a rehearing. After a careful examination of all the evidence, the majority of the court is of the opinion that the decision first promulgated, as it affects the defendant Roscoe was correct and the amended opinion of May 7 is ordered stricken. That this action is correct appears from the following facts:

The complaint alleges that Roscoe was the servant of Schwieger "in the construction of the highway and culvert and in protecting said work and the safety of the public in connection therewith." Roscoe's answer admits that he was the servant of Schwieger "in and about the construction of the culvert," but denies the remaining allegations.

The evidence would indicate that Roscoe was an independent contractor rather than an employee, but, as will appear later,

it is immaterial in which capacity he erected the culvert. The evidence is undisputed that he had nothing to do with the construction of the highway except to place the culvert in a cut left and prepared for that purpose, and that his work was completed, the forms removed, and the workmen and material withdrawn from the project at least two days before plaintiff sustained his injuries.

It is contended that there is a conflict in the evidence as to whether or not the concrete culvert had sufficiently dried to permit the filling in around it, and it is disputed that Roscoe's work had not been accepted and approved at the time of the accident. The evidence on which plaintiff relies in this regard hardly rises to the dignity of creating a conflict; certainly, the clear preponderance of the evidence is against plaintiff's contention.

The highway engineer in charge, Woodward, testified that a concrete structure is "completed" as soon as it is poured, "but it isn't hardened enough so that we can cover it until after seven days. The work can be done but we can't take the forms from the inside for seven days. The outside can be removed in twenty-four hours." Speaking of the instant culvert, he said, "The forms were removed on the last day of August, I saw them."

The testimony which is said to contradict Woodward is as follows: Adams, whose duty it was to make the fill, speaking generally, said: "We have to wait a certain length of time, * * * a lot of times twenty to twenty-one days after she is poured; a lot of them are sometimes different; well, it depends on what the engineer says about it; sometimes they will let you a little earlier * * * than twenty-one days." In other words, the engineer in charge, in this instance Woodward, is the one to say when the fill may be made, while in some instances conditions require a wait of twenty days or more; in this instance the fill could have been made September 1.

One Stone, an employee of Adams, merely testified that he knew that a cut should not be filled while the concrete was "green"; asked if the drying time was not usually from

twenty-one to twenty-eight days, he replied that he did not know; that he had had no experience with concrete work.

However, it is unimportant as to whether or not there was a conflict in the evidence on the subject; so long as the duty to maintain an adequate barrier and detour sign at the point where the road was closed was performed, the condition of the closed portion of the construction, including the location of the culvert, was immaterial. The requirement of the erection of the barrier and the closing of the road presupposes that beyond the barrier lies a danger zone.

It is also unimportant that Roscoe's work had not been "accepted." It was completed and he had withdrawn all control over it, so that it was at the time of the accident but an integral part of the unfinished highway, no part of which would be accepted until Schwieger's entire contract had been fully executed.

Roscoe visited the site of the culvert the day before the accident to see that the work was satisfactorily completed and that all of his property had been removed therefrom, but on that visit he came from the west and departed by the way he came; he did not therefore have occasion to note whether or not the barrier, located approximately half a mile to the east of the culvert, was in position.

As to the rules of law applicable to the situation disclosed by the foregoing evidence: One who renders service in the course of an occupation, and therein represents his employer's will only as to the result of his work, and not as to the means whereby it is accomplished, is usually an independent contractor, and he, and he alone, must respond for the injuries resulting during the progress of the work; but if, in the performance of the work, the necessary or probable result will be injury to third persons, both the contractor and contractee will be liable, the latter under the doctrine of *respondeat superior*. (See *Neyman* v. *Pincus*, 82 Mont. 467, 267 Pac. 805.)

"The general rule is well established that an independent contractor is not liable for injuries to third persons, occurring

after the contractor has completed the work and turned it over to the owner or employer and the same has been accepted by him * * * ; the latter is substituted as the responsible party. The reason for the substitution of liability is found in the general doctrine that an action for negligence will not lie unless the defendant was under some duty to the injured party at the time and place where the injury occurred which he omitted to perform." (14 R. C. L. 107.) The cases cited in support of the above text are of that class wherein an owner or contractor employs an independent contractor to work upon premises the possession of, and control over, which is surrendered to him, and consequently the independent contractor is not relieved of responsibility until his work has been accepted and the premises revert to the control of the owner or original contractor. Such is not the case here; as shown above the original contractor, Schwieger, was at all times in control of the entire projected highway, the dangerous condition existing at the culvert being but a part thereof. Schwieger was, under the contract, required to maintain the barrier and detour sign to protect the public from the dangerous condition created by the excavating for the installation of the culvert from the time it was left in the highway under construction until the entire highway was completed and opened for travel. It is clear that the situation is such that the rule of *respondeat superior* applies.

While it is shown that Roscoe's employees removed a portion of the barricade while hauling material to the culvert, it is undisputed that, on each occasion when this was done, the barricade was replaced as soon as a truck went through the opening thus made, and there is not a scintilla of evidence to show that Roscoe or his employees had any other knowledge than that the barricade was up at the time they left the premises, or that Roscoe knew the condition of the highway, east of the culvert, on September 1.

Either an independent contractor or a servant is liable to a third person injured by reason of the negligent handling of property when he owes a duty to such third person, but he

owes a duty to protect third persons only when he has such control over the property as the master or contractee would otherwise have. (*Hagerty* v. *Montana Ore Purchasing Co.,* 38 Mont. 69, 25 L. R. A. (n. s.) 356, 98 Pac. 643.) It is the owner, occupier or person in charge of premises who is in duty bound to keep the premises in a reasonably safe condition, so that those whom he has invited to enter upon them shall not be unreasonably exposed to danger, and one charged with this duty, who fails to prevent entry by means of proper barricades or warning signs, impliedly invites those who otherwise might lawfully enter, to come upon the dangerous premises. If, through his negligence to perform this duty, persons enter and are injured, he, and not his servant or an independent contractor who owed no such duty to the public, is liable for damages suffered by reason of his negligence. (3 Shearman & Redfield on Law of Negligence, 6th ed., 699; 45 C. J. 823–826; *Montague* v. *Hanson,* 38 Mont. 376, 99 Pac. 1063.)

On the day of the accident, Roscoe was neither "owner, occupier nor person in charge" of any portion of the new grade, and at no time had he been charged with the duty of maintaining a barrier at the point where the detour marked the end of the constructed grade and opened highway.

The judgment is sustained as to defendant Schwieger and reversed as to defendant Roscoe. Remittitur shall issue forthwith.

Mr. Justice Angstman, Dissenting:

I am unable to subscribe to the views of the majority with respect to the nonliability of defendant Roscoe.

In considering this question we must keep in mind the well-settled rules that the verdict of the jury will not be set aside if there is any substantial evidence to support it, and that the evidence, when conflicting, must be viewed in the light most favorable to the prevailing party. On motion for nonsuit·the evidence must be taken to establish whatever it fairly tends to prove. (*Boyd* v. *Great Northern R. Co.,* 84

Mont. 84, 274 Pac. 293.) And when defendant does not stand on his motion, but introduces evidence on his own behalf, all of the evidence in the case, including that offered by defendant, must be so viewed. (*Watterson* v. *Hill,* 84 Mont. 549, 276 Pac. 948.)

The evidence shows that Roscoe built the culvert. It was completed on August 31, but not yet accepted. Roscoe was personally at the culvert on September 1, spending two and a half hours there. He came from Glendive that morning, passed to the west of the culvert on the detour, then returned to a point opposite the culvert, crossed the railroad track, and went to the culvert. He must have seen the conditions as they existed at the point of the detour when he passed there on the morning of September 1, as did other witnesses who traveled the same route at about the same time. He knew, or should have known, that the dirt would not be filled in until the concrete dried, which, according to some of the evidence, takes about twenty days. Adams, whose duty it was to fill the dirt around the culvert, testified that "we have to wait a certain length of time. A lot of times twenty or twenty-one days after she is poured." Further, he said: "I filled as soon as after the concrete or right after the concrete was ready to be filled. * * * Well, I filled that right close as soon as it was ready to be filled; I don't know the exact day, but right soon. I was waiting for notice to fill that, when it was ready."

The dirt was not filled in until after the accident. The fact that the forms had been removed is wholly immaterial. The jury had the right to say from this evidence that, when the accident occurred, the concrete was not ready to have the dirt filled in.

I fail to see how it can be said that the evidence does not rise to the dignity of creating a conflict; and the issue as to where the preponderance of the evidence lies is one for the jury.

Also, Roscoe himself said: "I started this work about August 22d, 1928; 22d to the 24th." The employee Lenhart said: "We finished pouring the concrete about three days after

we started." If it only took seven days for the concrete to dry, as some evidence tends to show, and if the work was started on August 24, the pouring was not completed until the 27th. Seven days thereafter would be September 3, or one day after the accident.

The evidence, it should be remembered, should be viewed in the light most favorable to the prevailing party. Thus viewing it, the issue as to when the concrete was sufficiently dry to permit the dirt to be filled in was plainly one for the jury, and, having found for plaintiff on substantial evidence, its verdict should not be disturbed on this issue.

In the process of construction of the culvert large trucks were used by Roscoe and his men in hauling materials to the culvert. In doing so the new grade was used from the point of the detour part way to the culvert. There is some evidence that before the culvert was built, cars were able to get over the new road and through the excavation in which the culvert was later placed. The barricade which Adams said he erected was taken down by Roscoe and his men sufficient to permit the trucks to pass, and tracks were made by the trucks which helped to give the road past the detour the appearance of being in general use. The barricade was so constructed that it was easily and readily moved. Adams had completed the grading work about August 1, had moved his outfit, and was working with his crew some four miles west of the place of the accident at the time Roscoe was building the culvert. Roscoe and his crew, during the time the culvert was being constructed, were the only ones working on this particular piece of road. The jury had a right to find that Roscoe should have known that there was no one looking out for the safety of the public. Roscoe's employee, Lenhart, testified: "I couldn't say between the 15th and 20th day of August, when I was at work there, if there was anybody look out for the safety of the public at all."

The character of the barrier at the point of the detour at and prior to the time of the injury can best be shown by relating what the witnesses said. Defendants' witness Aaby,

an employee of the highway commission, said: "During the times I went by there and looked to see if the barricade was there I did have to arrange it or put it back several times. The poles and the posts would be slightly moved back or moved over so as to give more room in the north side of the road. * * * There was some space left by the barricade around which traffic or anybody could go. I should judge about four feet of space was left on the road. I remember there being something across there at times, yes. * * * The barricade was in what I would call good condition; I wouldn't do anything to it. I would judge about four feet of space was left on the road there, the same as I left it. * * * A great many times I would find no barricade there and I was afraid an accident might happen. That is the reason I found it down sometimes and not in place. I didn't —I didn't pay attention. I couldn't say how many times it was I had to arrange that barricade so it would completely stop cars from going off the road. There was always a gap of four feet on the north side where there wasn't a completed barricade. That four-foot space was sufficient for a car to get by if they went over the edge of the road. * * * I guess I did find that space on the north greater than four feet; sometimes it varied. If those trucks moved the logs they were supposed to put them back; certainly after each trip. I don't know if they didn't do it; I didn't watch them. I didn't know if it would take more than four feet for them to get by. I don't know what this four-foot space was left there for. I don't know if it was to make it convenient getting in there."

Adams, testifying to the kind of barricade that his men placed at the detour, said there was "wire stretched across the entire road, the entire width. I never went back there only—that was entirely shut off, that new piece of road. I did see it afterwards when the wire was gone; I seen it when the wire was gone. * * * The road was all closed but one side of the road where they could pass down on the shoulder, on the right-hand side. That would be the north side. The

shoulders of this road, just before the accident, had been kind of pushed down with the cars over it; it wasn't straight up and down.''

Defendants' witness Brittain, an employee of the state highway commission, said: ''There was a wire thrown from each side when they first opened the road up where it was stretched across. That was the wire that was across there in the first place before they ever opened it up. * * * The fence was right there before the new projected road was that I was speaking about. That was afterwards across where the road was, that was closed up. * * * Someone took the fence down that I saw was up there at first. I don't know who took it down. The barricade remained at it was. The one post on the north side would be moved off the road part of the time it was there. That was arranged that way so that they could get by there if they wanted to; so they could go into the Gifford place. * * * When the northern-most log was moved aside a vehicle could get by, a car or other vehicle, by running a little over the shoulder. And when the wheel ran over the shoulder the vehicle would be leaning a little to the north; to the outside. The grade there was soft. A car could not go around that barricade rapidly. * * * There was a number of times I stopped and straightened the barricade up. I found it disturbed. Logs would be rolled around one way or the other; the sign was turned over two or three times. * * * I was on the grade myself setting stakes * * * and two cars saw the car setting there, and one came through.'' As to what he saw after the accident, he said: ''I did notice the barricade when I went out there. There was one post laying on the south side of the road and the rest of the barricade was in the ditch. One of the small posts was lying on the south side; everything else was in the ditch. Everything else was clear so I could get through. This post lying on the south side—there wasn't more than three feet of the post in the road. The road was almost clear. The 'Road Closed' sign was in the ditch; the ditch was on the south side of the road. Mr. Adams and I

put the barricade up and stretched some wire up. ❋ ✱ ❋ It is true that at about 8 o'clock that night on September 2nd, after the accident, Adams and I came to this place of construction and then put up a barricade. I don't know whether Flossie Grant was right there at that time—I know who she is. She did say about that time, 'It is about time you are putting up a barricade.' I then put up a wire.''

Defendants' witness Woodward, an engineer for the highway commission, testified: ''This fence, by the way, was after, when Mr. Adams moved away, we put the barbed wire fence across the road and hung red flags along this point and we put some streamers so the people could see the barbed wire and wouldn't run into it. ✱ ❋ ✱ I came down there about a week after this fence was placed across the road with the red flags on it and it had been removed.''

Plaintiff's witness Jundt traveled the road in the afternoon of the day of the accident, and said there was then no barricade, sign or detour warning of any kind.

August Albrecht, a witness for plaintiff, testified to the same effect as of the afternoon of September 2, when he had occasion to travel the road west of Fallon.

Eamon testified for plaintiff that he was called to the road in the afternoon of September 2 to assist Jundt, who, in attempting to back away from the culvert, got off the grade. He said there was no barricade sufficient to warn people not to travel the road to the culvert. He said there was a log lying partly across the road, but it could not obstruct any one from traveling on the grade. He was corroborated by Henry Meidinger, who also assisted Jundt.

J. C. Jensen passed the place where the detour left the grade on many occasions during the week preceding the accident, and saw no adequate detour signs. He said he saw two or three posts and part of a telephone post and stick. He stated: ''There was nothing permanent to that obstruction.''

R. H. Wollin, principal of the Custer county high school, traveled the road on either Friday or Saturday preceding the accident (the accident happening on Sunday), and said there

were no detour signs or any signals or warnings of any kind with reference to the detour. J. E. Mutchler, instructor in mathematics in the Custer county high school, traveled the road on the day before the accident, and said there was no detour sign at that time.

According to all the evidence, there was no warning sign at the culvert. This, of course, made the culvert extremely dangerous, unless warning signals were maintained at the detour to advise people not to travel the new grade.

The evidence was ample to show that on September 1, when Roscoe spent two and a half hours inspecting the culvert, the road leading thereto from the east presented the appearance of being well traveled, and that, unless warning signs were maintained, the public, unfamiliar with the conditions, might be misled by its appearance into believing that it was open for travel.

The jury was warranted in finding that the barricade which was provided was not reasonably adequate and sufficient under the circumstances. It was for the jury to say under the evidence whether Roscoe knew, or in the exercise of reasonable care should have known, that the warning or detour sign was not of sufficient permanency to operate as an adequate safeguard to the public, and that defendant Roscoe, who built the culvert and thus created or greatly enhanced the danger to the public, did not exercise reasonable care for their safety under the circumstances. He knew, or should have known, that there was no one else in charge of that portion of the highway when he finished pouring the concrete who would guard the traveling public. In legal contemplation he was the one in charge of the culvert until it was accepted. There being sufficient evidence to warrant the jury in finding that Roscoe should have known when he last saw the culvert that there was no adequate detour sign to warn the public not to travel the new grade, the conclusion must follow that it was negligence, under the circumstances, to leave the work without other warning signs being given, either at the culvert or at the point of detour.

"What is ordinary care in a case of extraordinary danger would be extraordinary care in case of ordinary danger, and what would be ordinary care in case of little danger would be much below that in case of great danger." (Thompson on Negligence, 152, quoted with approval in *Liston* v. *Reynolds,* 69 Mont. 480, 223 Pac. 507.) Without adequate detour signs to warn the public not to travel the road to the culvert, the latter presented a situation of extraordinary danger. It was literally a death trap. The verdict of the jury indicates that it was of opinion that defendant Roscoe did not exercise proper care commensurate with the danger. I think there was sufficient evidence to warrant the jury in so believing.

Schwieger testified that, according to his agreement with Roscoe, the latter "was to go in on the job and build the structure according to my original contract with the State Highway Department." Roscoe enhanced the danger of the road by putting in the culvert. The danger, it is true, would not have existed if the road had not been held out as ready for travel. Adams, who had the contract for the grading, was not in actual control of that part of the highway when Roscoe built the culvert. This, defendant Roscoe should have known. Roscoe, as above stated, was the only one working on this part of the highway at the time he built the culvert. He could not create or enhance the danger to the public without taking necessary precautions for their safety. He knew, or should have known, that the dirt would not be filled in at the culvert until the concrete was dry. The work was not yet accepted when he left it on September 1, nor at the time of the accident.

While it is true that, where service is restricted to a single act or transaction, the relation of master and servant terminates upon the completion of the work (*Wilkinson* v. *Myatt-Dicks Motor Co.*, 136 La. 977, L. R. A. 1913E, 439, 68 South. 96); yet where, as here, the work had not been accepted by the employer, and where it required time to dry it cannot be said that the work was fully completed on Sep-

tember 2. Nor is this case the same as that of *Donovan* v. *Oakland & Berkeley Rapid Transit Co.*, 102 Cal. 245, 36 Pac. 516, relied upon by defendant Roscoe, for there the employer was actually present when the work was performed by the employee or independent contractor and exercising control over the premises, and, in legal contemplation, accepted the work. (See 14 R. C. L. 86, and *Mansfield Construction Co.* v. *Gorsline*, (Tex. Com. App.) 292 S. W. 187, where the *Donovan Case* is referred to.)

The importance of an acceptance of the work by the employer is alluded to in the case of *Mansfield Construction Co.* v. *Gorsline*, (Tex. Com. App.) 288 S. W. 1067. It is true in the last-cited case the contract specifically provided that the work shall be accepted when fully completed and finished to the satisfaction of the county engineer. But here the evidence shows that the work was that of the respective contractors until accepted, and that Adams, who was chargeable with the duty of filling in the dirt, had not been notified of the completion of the work prior to September 2. In the *Mansfield Case*, notice had been given and the work accepted.

It is of no consequence that Roscoe may not have been in legal contemplation in control of the highway. The test is: Did he owe a duty to the public, including the plaintiff? "Generally speaking, one is responsible for the direct consequences of his negligent acts whenever he is placed in such a position with regard to another that it is obvious that if he does not use due care in his own conduct he will cause injury to that person. * * * If one shall make an excavation so near the line of the highway that one lawfully making use of the highway might accidentally fall into it, his duty to erect guards as a protection against such accidents is manifest, and he will be responsible for injuries occasioned by his neglect to do so." (Cooley on Torts, 4th ed., sec. 478.) And I perceive no difference in principle as regards the duty to erect guards between a case where the dangerous excavation is on or near a highway in regular use as such and a situation as here, where it existed on what the traveling public might

reasonably be misled by appearances into believing was the highway. (Compare *Furlough* v. *Nash County Highway Commission*, 195 N. C. 365, 142 S. E. 230.

If it be assumed, as stated in the majority opinion, that Roscoe and his men replaced the barricade removed by them to permit their trucks to pass, liability still exists, if the jury found from the evidence, as it was warranted in doing, that the barricade was so flimsy and unsubstantial as not to operate as an adequate safeguard to the public.

The suggestion that "the requirement of the erection of a barrier and the closing of the road presuppose that beyond the barrier lies a danger zone," as stated in the majority opinion, was the exact situation here. It was a danger zone beyond the point of the detour. There was a death trap hidden from the view of those traveling the new road, until too close to it to avoid its dangers.

I think the learned trial judge properly submitted the case to the jury as to both defendants, and that the judgment against both should be affirmed.

MR. JUSTICE FORD: I concur in the views of MR. JUSTICE ANGSTMAN.