No. 83-476

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

KATHERINE CASH,

        Plaintiff and Respondent,

   -vs-

OTIS ELEVATOR COMPANY, a corporation,
**and** COUNTRY CLUB MANOR, a co-partnership,
d/b/a MUELLER APARTMENTS,

        Defendants and Appellants.

---

APPEAL FROM:   District Court of the Second Judicial District,
                In and for the County of Silver Bow,
                The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

       For Appellants:

             Corette, Smith, Pohlman & Allen; Gregory C. Black
             & R. D. Corette argued for Mueller Apts., Butte,
             Montana
             Poore, Roth & Robinson; C. Richard Anderson argued
             for Otis Elevator, Butte, Montana

       For Respondent:

             John L. Peterson argued, Butte, Montana

---

                Submitted:   March 22, 1984

                  Decided:   June 6, 1984

Filed:   JUN 6 - 1984

*Ethel M. Harrison*

                Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Defendants Otis Elevator Company (Otis) and Country Club Manor, a co-partnership, d/b/a Mueller Apartments, (Mueller) appeal from a judgment entered by the District Court of the Second Judicial District, Silver Bow County, awarding $108,000 plus costs and damages for personal injury.

At about 1:00 o'clock a.m. on August 20, 1981, plaintiff went to the Mueller apartment building to visit a tenant. She entered the lobby and pushed the elevator call button. After briefly visiting with other people in the lobby, plaintiff opened the hoistway door to the elevator and stepped forward. The elevator car was not at the lobby floor level and plaintiff fell approximately fifteen feet down the elevator shaft. Plaintiff instituted this action to recover for her personal injuries suffered in the fall.

Mueller had a maintenance agreement with Otis whereby Otis agreed to make monthly service calls and provide emergency services when notified of problems. Following the accident, Mueller notified Otis. Otis dispatched an employee to the premises. Upon inspection a brass hook, which was part of the lobby floor interlock system, was found to be bent. The elevator door, under these conditions, could be opened without the elevator car being present.

Plaintiff was taken to the hospital after the accident and found to have a blood alcohol content of .16%. Plaintiff's intoxication was considered by the jury.

The trial court found defendants negligent as a matter of law and submitted causation and contributory negligence to the jury. The jury found plaintiff to be contributorily negligent and attributed 20% of the total cause to plaintiff's conduct. The balance of cause was divided 40% to Mueller and 40% to Otis.

2

The following issues are presented on appeal:

1. Whether the District Court erred in finding Otis and Mueller or either of them guilty of negligence as a matter of law?

2. Whether the District Court erred in instructing the jury that defendants owed to plaintiff the highest degree of care?

3. Whether the District Court erred in refusing defendant's proposed instruction on independent intervening cause?

4. Whether the District Court erred in excluding the testimony offered by Otis from a toxicology expert regarding the number of drinks consumed by the plaintiff on the night of the accident?

5. Whether the District Court improperly awarded certain costs to the plaintiff?

ISSUE 1:

WHETHER THE DISTRICT COURT ERRED IN DIRECTING A FINDING OF NEGLIGENCE AGAINST OTIS AND MUELLER OR EITHER OF THEM?

The trial court premised its negligence ruling on defendant's violation of an administrative safety code and upon the application of res ipsa loquitur. If a directed finding of negligence was proper, we will not reverse the case because the trial court premised its ruling upon a faulty basis. Laurie v. M. & L. Realty Corporation (1972), 159 Mont. 404, 408, 498 P.2d 1192, 1194.

Before examining the applicability of res ipsa loquitur to the case at bar, we must see if there were specific acts of negligence which were unrebutted and which would permit a directed verdict on negligence. If such negligence is found and was unrebutted, the finding can be sustained without resolving the res ipsa issue.

3

A case may only be withdrawn from the jury if there are no genuine and material issues of fact about which twelve reasonable people can disagree. Sistock v. Northwestern Telephone Systems, Inc. (Mont. 1980), 615 P.2d 176, 37 St.Rep. 1247. Because the record contains different evidence as to each of the two defendants, the case against each of the defendants is discussed separately.

Mueller is the owner of the premises in question. The parties agree that plaintiff is an invitee. A property owner's duty toward an invitee is to use ordinary care to keep the premises reasonably safe and to warn the invitee of any hidden or lurking dangers. Cereck v. Albertson's, Inc. (1981), 195 Mont. 409, 637 P.2d 509; Rennick v. Hoover (Mont. 1980),606 P.2d 1079, 37 St.Rep. 308. However, in the operation of an elevator, we feel the owner owes a higher degree of care. The elevator performs the function of a common carrier in transporting people from one floor to another. Experience teaches that the public reposes trust in those who furnish that carriage, that they will be transported safely from one floor to another. A number of jurisdictions have held that, with respect to operation of the elevator itself, the premises owner owes the highest degree of care. Johnson v. Hopkins (1925), 213 Ala. 492, 105 So. 663; Stewart v. Beegun (1970),126 Ill.App.2d 120, 261 N.E.2d 491. We feel that the best public policy is served by adopting this higher standard for Montana.

Plaintiff contends that Mueller was negligent as a matter of law for violating specific provisions of the Montana Safety Code for elevators. The District Court found that the defendants were negligent per se for having violated the safety code relating to the operation of the hoistway-door interlock device. The code defines this device and its integrated system in the following manner:

4

"Hoistway-Door Electric Contact. An electrical device, the function of which is to prevent operation of the driving-machine by the normal operating device unless the hoistway door is in the closed position . . .

"Hoistway-Door or Gate Locking Device. A device which secures a hoistway door or gate in the closed position and prevents it from being opened from the landing side except under certain specified conditions.

"Hoistway-Door Combination Mechanical Lock and Electric Contact. A combination mechanical and electrical device with two related, but entirely independent functions, which are:
(a) to prevent operation of the driving-machine by the normal operating device unless the hoistway door is in the closed position; and
(b) to lock the hoistway door in the closed position and prevent it from being opened from the landing side unless the car is within the landing zone.

"NOTES (Hoistway-Door Combination Mechanical Lock and Electric Contact):
(a) These functions are subject to the modifications specified in Rule 111.4b of this Code.
(b) As there is no positive mechanical connection between the electric contact and the door locking mechanism, this device insures only that the door will be closed, but not necessarily locked, when the car leaves the landing. Should the lock mechanism fail to operate as intended when released by a stationary or retiring car-cam device, the door can be opened from the landing side even though the car is not at the landing. If operated by a stationary car-cam device, it does not prevent opening the door from the landing side as the car passes the floor.

"Hoistway-Door Interlock. A device having two related and interdependent functions which are:
(a) to prevent the operation of the driving-machine by the normal operating device unless the hoistway door is locked in the closed position; and
(b) to prevent the opening of the hoistway door from the landing side unless the car is within the landing zone and is either stopped or being stopped." ANSI-ASME A17.1 - 1981 at 4.

The unrebutted testimony of Ken Marshall, an elevator inspector for the State of Montana, showed that when an interlock system is functioning in accordance with the safety code, the door cannot be opened if the elevator car is not at the floor. Mr. Marshall, without contradiction, testified

that the particular interlock system in the defendant's elevator was operating in violation of the safety code.

We held in Stepanek v. Kober Construction (Mont. 1981), 625 P.2d 51, 38 St.Rep. 385, that a violation of an administrative code is evidence of negligence but is not negligence per se. Plaintiff seeks to distinguish Stepanek for the reason that the Montana Legislature mandated the adoption of the safety code which is here involved. Specific reliance is placed upon sections 50-60-203 and 50-60-702, MCA. Those sections read as follows:

"50-60-203: Department to adopt state building code by rule. (1) The department shall adopt rules relating to the construction of, the installation of equipment in, and standards for material to be used in all buildings or classes of buildings, including provisions dealing with safety, sanitation and conservation of energy. . .

"(2) The department may adopt by reference nationally recognized building codes in whole or in part, but this does not prevent the department from adopting rules more stringent that those contained in such codes."

"50-60-702: Department to adopt inspection standards--certification of inspectors. (1) The department shall adopt standards for passenger elevator and escalator inspections that assure compliance with the requirements of the state building code.

"(2) The department shall adopt rules for the certification of maintenance and insurance company inspectors who may inspect passenger elevators and escalators pursuant to 50-60-701."

Plaintiff argues that the legislature cannot set forth verbatim a lengthy and detailed building code. We agree. However, the legislature did not incorporate this administrative code by reference. The legislature simply mandated that the Department of Administration adopt rules. The Department did so. The legislature did not act further to adopt those rules. Under these circumstances, the administrative code does not become part of a statute by reference. Therefore, violation of the code is evidence of negligence rather than negligence per se.

6

The unrefuted evidence in this case showed a violation of the administrative code and such a violation provided clear evidence of negligence. In fact, the defendant-owner submitted the following jury instruction which was refused:

"You are instructed that both defendants in this case are subject to the provisions of the Safety Code for the Elevators and Escalators, ANSI/ASME A17.1, 1981, as adopted by the State of Montana pursuant to law. If you find from the evidence that the elevator at the Mueller Apartments at the time of plaintiff's accident was in an operating condition which was in violation of the safety code and that violation was a proximate cause of plaintiff's injuries, you are instructed that such a violation raises a rebuttable presumption of negligence on the part of one or both of the defendants. The defendants then have the burden of proving by a preponderance of the evidence that one or both of them did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."

We do not agree with the proposed instruction in that the burden of proof does not actually shift to the defendant. We do agree that violation of the code provided evidence of negligence and that it was incumbent upon the defendant to come forward with evidence that would show the defendant exercised due care. This the defendant-owner failed to do. We have carefully examined the record and defendant-owner called but two witnesses. The owner, John Cote, was the first witness. A fair summary of Mr. Cote's testimony is that he had no personal knowledge of the condition of the elevator at the time the accident happened and immediately prior thereto. He testified that he relied upon Otis for servicing and maintaining the elevator and upon his building manager to discover problems and report them to Otis.

The building manager was the other witness. Sharon Stephens stated that she had previously discovered problems with the elevator and reported them to Otis. She had no knowledge of any defects in the elevator immediately prior to the time the accident occurred. However, defendant Mueller

7

offered no testimony to show that either the building manager or the owner ever inspected the elevator to determine whether the interlocking device was defective or whether the door would open with the elevator at a remote location.

The record in this case shows a violation of the Administrative Code providing evidence of negligence. The defendant has in no way attempted to rebut this testimony except to show that responsibility for operation and maintenance of the elevator was contracted away to Otis.

Plaintiff contends that responsibility for a safe elevator could not be delegated by the owner to Otis. Plaintiff argues nondelegable duty. The concept was first articulated by the Montana Supreme Court in Ulmen v. Schwieger (1932),92 Mont. 331, 12 P.2d 856. In Ulmen, this Court held that, although one is not generally liable for the negligent acts of an independent contractor, nevertheless, one remains liable for the work of an independent contractor where the work to be done is intrinsically dangerous. The nondelegable duty recognized in the Ulmen case was cited with approval and relied upon in Stepanek v. Kober Construction, supra.

Courts of other jurisdictions recognize that elevators, if defective, are dangerous instrumentalities. Sweeney v. Levy (1948), 67 Pa.D.C 5. In Stewart v. Beegun, supra, the Illinois Court held that a defendant-owner could not be absolved from liability by a showing that owner had delegated maintenance of the elevator to another. In accord see Phegley v. Graham (1948), 358 Mo. 551, 215 S.W.2d 499.

In this case the evidence clearly shows that defendant Mueller violated the Administrative Code provisions covering elevators. This evidence was not attacked nor impeached. Rather, Mueller defended by showing reliance upon Otis. If Otis was negligent in failing to discover the defect on

8

August 4th, Mueller would be liable under nondelegable duty. If the defect was not there at the last Otis inspection it had to have developed at a time that only Mueller was in control. Mueller has presented no evidence to show what Mueller did since the last inspection which would rebut the code violation. Under these circumstances the trial court was correct in directing a finding of negligence against defendant Mueller.

The case against defendant Otis is different. Plaintiff presented expert testimony which, if believed, would prove that the defective hook existed prior to the time Otis made its inspection on August 4, slightly more than two weeks prior to the accident. However, Otis presented testimony from its inspector that the hook was examined at the time of the inspection on August 4. This witness testified that the hook was in good shape at that time. This testimony, if believed, would allow the jury to infer that the hook became bent at a time following the inspection. Under these circumstances the jury could return a defense verdict for Otis.

We must emphasize that Otis had no ownership interest in the elevator. In 1980 Otis became obligated to service the elevator pursuant to the provisions of a contract with the owner, Mueller. The inspection obligation was to be discharged monthly. Otis inspected on August 4. No calls were made by the owner to Otis requiring Otis to return to the premises subsequent to August 4 and prior to the happening of this accident on August 20. If the jury believed plaintiff's expert, then the jury would find against defendant Otis for the reason that the defect must have been there at the time of the inspection. However, if the jury chose to believe Otis' inspector, then the jury could find for defendant Otis on the basis that the hook became bent

9

following the inspection and no breach of duty occurred on the part of Otis.

If the case against Otis is retried, the question may arise regarding applicability of the Administrative Code to Otis. Otis here argues the code only applies to owners. Although section 2.32.604(8) A.R.M. makes the owner responsible for obtaining a certificate of inspection for elevators, we cannot say the code provisions generally should be so limited. This Administrative Code creates standards. The violation of those standards is evidence of negligence on the part of anyone who properly has a duty to prevent such violation. This may include an elevator maintenance company. However, any evidence of code violation can be rebutted by showing that Otis only had a duty to make monthly inspections and respond to emergency calls. If the jury were to find that any code violation did not exist at the time of the last required inspection and no calls were made summoning special service, then Otis would be absolved.

The judgment against Otis must be vacated and the case returned for trial. Since we affirm the directed finding against Mueller based on specific acts of negligence, we need not consider the res ipsa loquitur question. Upon any retrial against Otis, should plaintiff seek to rely on res ipsa to create a jury issue, the trial court should apply the principles of Tompkins v. Northwestern Union Trust Co. (Mont. 1982), 645 P.2d 402, 39 St.Rep. 845, to the facts adduced at trial.

ISSUE 2:

WHETHER THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY THAT DEFENDANTS OWED TO PLAINTIFF THE HIGHEST DEGREE OF CARE?

Plaintiff argues it was proper to instruct the jury that defendants owed to plaintiff the highest degree of care, although the court had previously directed a finding of

10

negligence against defendants. The basis for plaintiff's argument is that the jury must know that the highest degree of care is owed in order that percentages of negligence can be assigned the respective parties. Technically this is not so. The jury is properly charged to find whether the plaintiff is negligent and if so, the percentage that the conduct of each negligent party contributed to the cause. In other words, the jury does not gauge the negligence of plaintiff by comparing it to the negligence of defendant. If all were negligent then the jury determines the percentage that the conduct of each contributed to the totality of plaintiff's injuries.

We do find that this instruction was harmless error. We have previously decided that the highest degree of care was owed. Under the circumstances, it was not prejudicial to give the instruction.

ISSUE 3:

WHETHER THE DISTRICT COURT ERRED IN REFUSING DEFENDANT'S PROPOSED INSTRUCTION ON INDEPENDENT INTERVENING CAUSE?

Otis claims error in failing to give its offered instruction No. 12. That instruction said:

"In determining whether a Defendant's negligence in creating a hazard was a proximate cause of the accident, the following test is to be applied:

"Did the wrongful act, in a natural and continuous sequence of events, which might reasonably be expected to follow, produce the injury? If so, it is a concurring proximate cause of the injury even though the later negligent act of another person cooperated to cause it.

"On the other hand, if the latter's negligent act in causing the accident was of such a character as not reasonably to be expected to happen in the natural sequence of events, then such later act of negligence is the independent, intervening cause and therefore the sole proximate cause of the injury."

11

While the above-quoted instruction may not be erroneous, it was not necessary and in fact is confusing. Court's instruction No. 7 stated:

"You are instructed that the proximate cause of an injury is that which, in a natural and continuous sequence, underlined unbroken by any new cause, produces the injury, and without which the injury would not have occurred." (emphasis supplied)

Court's instruction No. 7 sufficiently stated the law of intervening cause. We do add that the old language employed in proximate cause instructions is being discarded in favor of language more easily understood by a lay jury. However, court's instruction No. 7 was an accurate statement of the law and adequately covered the subject.

ISSUE 4:

WHETHER THE DISTRICT COURT ERRED IN EXCLUDING THE TESTIMONY OFFERED BY OTIS FROM A TOXICOLOGY EXPERT REGARDING THE NUMBER OF DRINKS CONSUMED BY THE PLAINTIFF ON THE NIGHT OF THE ACCIDENT?

Defendants claim error because the trial court refused to allow a toxicology expert to testify about the number of drinks consumed by the plaintiff on the night of the accident. Plaintiff's alcoholic blood content of .16% was admitted without objection. The toxicologist, over plaintiff's objection, testified about the affect upon a person of different ranges of alcohol blood content. This expert was then asked to give testimony as to "the amount of alcohol necessary to be consumed" for plaintiff to have a blood alcohol content of .16%.

The admission of this kind of testimony is discretionary with the trial court. Since the jury had already received evidence regarding the blood alcohol content and the affect that such a blood alcohol content would have upon a person, the court was justified in finding that the jury need not be told by the expert the number of drinks consumed by the

12

plaintiff. The relevant consideration is whether the plaintiff was intoxicated, and if so, how that affected the plaintiff's conduct on the night in question. Other probative evidence on this issue was considered by the jury. The trial court is vested with great latitude in ruling on the admissability of expert testimony. Krohmer v. Dahl (1965), 145 Mont. 491, 402 P.2d 979. We hold that the trial court's ruling here was not clearly erroneous nor sufficiently prejudicial to require a new trial.

ISSUE 5:

WHETHER THE DISTRICT COURT IMPROPERLY AWARDED CERTAIN COSTS TO THE PLAINTIFF?

Defendants claim that the costs of two depositions and certain photographs are not recoverable. Both the photographs and the depositions were used at time of trial. The trial court, after hearing and briefs, entered its order of August 2, 1983, which stated:

> "After considering the memoranda on file and the oral arguments heard in the above-entitled court on July 15, 1983, this court finds that the depositions of Stephens and ____, although not introduced into evidence, were used during the trial for impeachment purposes. The court further finds that the photographs were necessary expenses as contemplated by section 25-10-201(a), MCA (1981)."

Deposition costs are allowable where the deposition is used at trial. These depositions were used to impeach. Therefore the costs were recoverable. Morrison-Maierle, Inc. v. Selsco (Mont. 1980), 606 P.2d 1085, 1088, 37 St.Rep. 299, 303.

With respect to the photographs, section 25-10-201(a), MCA, allows the taxing of costs for "reasonable and necessary expenses as are taxable according to the course and practice of the court or by expressed provision of law". The trial court's broad authority for taxing costs permitted the taxing of this photography expense.

13

The judgment against defendant Country Club Manor, co-partnership d/b/a Mueller Apartments, is affirmed. The judgment against Otis Elevator Company is vacated and the cause remanded for trial in accordance with the legal principles enunciated herein.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice Fred J. Weber dissents:

I respectfully dissent from the conclusion of the majority that the District Court did not err by instructing the jury that defendants were negligent as a matter of law. I conclude that the District Court improperly became a trier of disputed fact.

In finding both defendants negligent as a matter of law, the District Court based its decision first on res ipsa loquitur and secondly on negligence per se, arising from the violation of the safety code. The majority has not affirmed either theory. The majority did not consider the res ipsa loquitur theory. With regard to negligence per se, the majority concluded only that "violation of the code is evidence of negligence rather than negligence per se." I agree with that determination. Upon that basis, the determination of negligence as a matter of law should be reversed.

The majority correctly points out that a case should be withdrawn from the jury only where there are no genuine and material issues of fact about which twelve reasonable people could disagree. The majority then briefly analyzes the evidence and concludes that defendant Mueller failed to come forward with evidence to show that the defendants exercised due care. I do not find that the record supports this conclusion.

Sharon Stephens, the building manager for Mueller, testified at length. Otis Elevator had the contract for maintenance of the elevator. Sharon had authority to call Otis to make repairs. She summarized her authority and duties as follows:

> "A. General safety and traffic precautions as
> making sure that all outer doors on all floors were
> closed so that the elevator could operate.

15

"Q. Did you ever look for any other problems with the elevator?

"A. Yes, I did. I rode it constantly.

"Q. Could you ascertain whether there was a problem in terms of function of the motor?

"A. I could by listening.

"Q. Did you know what those problems were exactly?

"A. No, I am not an engineer. Just it is simply that I could ascertain something was not running as it should."

If something went wrong, Sharon called Otis. She testified no complaints were made during the 15 days prior to the accident:

"Q. Turning your attention to August, 1981, from the 5th day of August, 1981, until the 20th day of August, 1981, were you ever notified or made aware of any problem whatsoever with the elevator at the Mueller Apartments? . . .

"A. I was given no notification that the elevator wasn't working perfectly.

"Q. Were you living at the Mueller Apartments at that time?

"A. I was.

"Q. Did you use the elevator on a daily basis?

"A. I did."

With regard to her use of the elevator during the 24 hours preceeding the accident, Sharon testified:

"Q. Turning your attention to the 19th day of August, 1981, did you use the elevator on that day?

"A. Yes, I did.

"Q. Was that during the daytime?

"A. During the daytime and also in the evening.

"Q. What was the occasion for your using that elevator that evening?

"A. There was a very bad electrical storm with wind and lots of rain. All of the west hallway windows were open because it had been a hot day. I went to all floors and closed all those windows.

"Q. Did you use the elevator to go from floor to floor?

16

"A.  I did.

"Q.  Did your use of the elevator at that time take you to the lobby?

"A.  It did."

Sharon testified she had resided at the apartment from July 1979 to August 1981, the date of the accident. She testified that Otis maintained the elevator in excellent condition. When there was a problem, she summoned Otis. It was her responsibility to make certain the elevator was not abused by tenants which included not letting the tenants slam the doors. When the doors were slammed, the users were immediately admonished; and the slamming of doors took place on rare occasions. With regard to the care and maintenance of the elevator, Sharon further testified:

"Q.  With regard to the elevator operation itself, I assume that you had some discussions with the Otis Elevator people when you made calls and they came to the elevator on emergency calls, did you not?

"A.  Yes.

"Q.  According to the records that have been provided to us, there were at least 10 emergency calls in 1981 up until the date of the accident.

"A.  Surely.

"Q.  And then there were routine visits by the Otis Elevator Company.

"A.  Correct.

"Q.  Did you yourself ever ask anyone from Otis Elevator what, if anything, you should look for to see, to make sure the elevator was in good working condition?

"A.  I don't believe I ever did.

"Q.  Did you ever receive any instructions from Mr. Sprague (an employee of Otis) relative to the operation of the elevator?

"A.  Yes.

"Q.  What was that?

17

"A. Well the general checking, you know, of locks, or listening in case the motor lugged down, ran slow.

"Q. Anything else?

"A. Checking it for leveling.

"Q. Is that it?

"A. There may have been more. I don't recall anything right now."

With regard to the operation of the elevator itself, Sharon testified it worked well:

"Q. With regard to the elevator trouble, how would you characterize the overall operation of the elevator with regard to whether it was working or not?

"A. Overall it operated very well."

Sharon also testified at length with regard to the maintenance of the elevator by the named representatives of Otis. She pointed out that she was more than satisfied with their work. The repairmen resided in Butte and responded immediately. Sharon had no trouble with the assistance which Otis gave to keep the elevator in good condition. Sharon also testified that after the plaintiff's fall, she looked at the elevator and the hook on the elevator door and saw that the hook was bent.

The defendants presented additional evidence which showed that the elevator had been well maintained and was in good working condition. All of that evidence taken together rebuts the majority's conclusion that the defendant failed to come forward with any evidence showing due care and failed to rebut the evidence of negligence. My review of the evidence suggests that the following findings can be made from the evidence submitted by the defendants:

(1) That the building manager had lived in the building for two years and constantly rode the elevator; that she rode the elevator a number of times on the day of the accident and

observed nothing wrong; that no complaints of any type had been made to her about the defective operation of the elevator; and that the elevator was in good operating condition on the date of the accident.

(2) That the building manager was given the obligation to see that the elevator was properly functioning and was given authority to call Otis in the event of any defects of operation; that she was aware of the problem which could occur from slamming of the elevator doors and posted signs and also admonished elevator users not to slam the doors, so that slamming was a rare happening.

(3) That the building manager was in constant contact with the Otis Elevator people, who immediately responded to requests for repair assistance and did an excellent job of repair, so far as the manager could determine; that there had been a total of ten emergency calls to Otis in 1981 prior to the August 20th accident; that the Otis repairman inspected the elevator on August 4, 1981; and there had been no complaints from that time to the date of the accident.

This evidence clearly raises an issue of fact as to whether the defendants acted as reasonable men exercising due care under the circumstances. The jury should have been allowed to perform its function as the trier of fact. The jury should have weighed the evidence of due care on the part of the defendants, the evidence of negligence arising from the violation of the elevator code, and the remainder of the evidence. Thereafter, the jury should have determined whether or not the defendants were negligent. That issue of disputed fact was improperly resolved by the District Court.

The majority sets a standard of "highest degree of care" for the operation of an elevator, and points out that the elevator is performing the function of a common carrier.

19

Those conclusions are based on authority which I find unpersuasive - a 1925 Alabama Supreme Court decision and a 1970 Illinois intermediate appellate court decision. Such conclusions may have been appropriate in earlier years when the rule of contributory negligence might have barred any recovery by a plaintiff, such as the plaintiff in this case. I do not believe such a rule is necessary any longer for the protection of elevator users in Montana. The rule of comparative negligence applies. The jury is eminently capable of comparing the negligence on the part of the building owner, the elevator maintainer and the user.

I would reverse the judgment and remand for new trial as to both defendants Mueller Apartments and Otis Elevator Company.

_____
Justice

Mr. Justice John C. Sheehy, dissenting and concurring:

I concur in the result as to Mueller Apartments, but dissent from much of what is said with respect to Mueller Apartments, and dissent from the majority holding as to Otis:

I concur with the majority that Mueller Apartments raised no issue of material fact on which it had a right to a jury decision. There can be no conclusion of fact but that on the early morning of August 20, 1981, Mueller was in violation of the state building code, and its counterpart elevator code because of the defective condition of the brass door latch which was a part of the interlock system.

It necessarily follows that I disagree with Justice Weber's dissent, which finds an issue of material fact in the testimony of Sharon Stephens. The Stephens' testimony did not raise an issue of fact for the jury to determine. Her testimony is that she went up and down in the elevator on the evening of August 19 to close windows and she also testified generally that the elevator was usually in good working condition. However, her use of the elevator doors was always when the elevator car was at the landing when she opened the door. Nothing in her testimony indicates she ever tried to open the lobby elevator door when the elevator car was not at that landing. From the testimony in the whole record, it is clear that the only person who tested the lobby door when the elevator car was not at the landing was Katherine Cash, and she paid the price. The testimony of Sharon Stephens therefore does not raise an issue of fact.

A person using the elevator in the manner of Sharon Stephens who opened the first floor elevator door when the car was in that landing position would not have discovered

that the brass door latch was in fact defective. Opening the door when the car was in position would not have shown that the door also opened if the car was not in the landing position on the first floor.

On that basis, I would hold that res ipsa loquitur applied as far as Mueller Apartments is concerned because nothing the owner or its agents testified to excuses the presumption of negligence in presenting to the public an elevator door which would open without the car being at the landing. In particular, their testimony does not disprove the testimony of expert Marshall that it would have taken years to bend the interlock latch. I dissociate myself from the majority opinion, because I feel res ipsa loquitur applies here.

In another respect, I also remove myself from the majority in its reluctance to declare the violation of the state building code and its accompanying elevator code, as negligence per se.

Under section 50-60-203, MCA, the Department of Administration was mandated by the legislature to adopt rules relating to the construction and installation of equipment in public buildings whether privately or governmentally owned. The department obeyed that mandate and there are in force in this state specific regulations adopted by the department known as the state building code, which encompasses the state elevator code. A willful violation of the state building code, or a refusal to cure a violation after 30 days notice from the department is a misdemeanor. Section 50-60-110, MCA. It is not jurisprudentially consistent to hold, as we have, that a violation of the motor vehicle code which provides criminal penalties, is negligence per se, but to

withhold that same rule of law from violations of the state building code, which was mandated by the legislature, adopted after hearings, and carries with it criminal penalties. No sound reason is advanced by the majority for taking a weaker position in holding that violation of the state building code is only evidence of negligence.

There is a vital difference in classifying a violation of a state building code as merely evidence of negligence from a declaration that it is negligence per se. Under the state building code, the duty of the landowner to provide an interlocking system on his elevator doors is absolute. It is intended to secure to users of passenger elevators the safe operation of doors to elevators and to protect the class of persons which included the plaintiff who would be rightfully using the passenger elevators. When the duty is absolute, it makes no difference that the owner may have been using due care, though due care is argued by Justice Weber in his dissent:

> "Liability for an injury resulting from the breach of an absolute statutory duty constituting negligence per se or as a matter of law may not be escaped by proof that the breach was in fact made in the exercise of due care.. . ." 57 Am.Jur.2d. 623, Negligence § 239.

Of course, the violation of a statutory duty must be proven to be a proximate cause of the eventual injury suffered by the plaintiff, but that is not a problem in this case. If a violation of the state building code is to be merely evidence of negligence, it would be pertinent and proper to allow evidence of efforts on the part of the landowner to use due care, and thus to escape the absolute duty imposed by the building code. This Court has not hesitated to accord to municipalities the recognition that

- 23 -

violation of city ordinances constitutes negligence per se (Marsh v. Ayers (1927), 80 Mont. 401-411, 260 P. 702.) Should we not accord the same recognition to building standards which are nationally recognized and adopted, which are penal in nature, and which are designed to protect persons such as the plaintiff in this case?

When a statute, ordinance, or code has been duly adopted by governmental authority for the protection of a class of persons, the standard of conduct of a reasonable person is established by the legislative enactment. The duty of a judge or jury trying the facts, when a violation of that standard is charged, is to determine if in fact the violation occurred. The judge or jury is not called on to make a common-law determination as to whether the violation constitutes negligence. It has become negligence to violate the standard by legislative enactment. Therefore, when the evidence, as here, shows the standard was violated, there is nothing for the judge or jury to decide as to negligence; the standard of conduct of a reasonable person, prescribed by the statute, ordinance or code, cannot be changed by the judge or jury to a lesser or greater duty. If the actual violation of the standard is beyond cavil, the jury must be told that negligence has occurred as a matter of law. The remaining question for the jury is whether the negligence is the proximate cause of the injuries claimed because of the violation.

The majority by holding that a violation of the state building code is merely evidence of negligence is implying that other evidence may be produced to show that a violation of the state building code is not negligence. In that position the majority is illogical. If the state building

code does not prescribe the standard of conduct for a reasonable person, then, to determine negligence, resort must be had to the common law to determine negligence. Instead of applying the standard of conduct prescribed by the building codes, the standard of reasonable care would be one applied by the court or the jury to the facts of the case as though the building code were absent. I find that possibility anomalous.

I dissent completely from the majority in returning this cause to the District Court for retrial as to Otis Elevator Company. I would affirm the action of the District Court in directing that the jury find Otis negligent both because of violations of the elevator safety code, and under the rule of res ipsa loquitur.

The violation of the elevator safety code is established beyond question. The interlock system was not working on the night that Katherine Cash was injured. Otis Elevator shared the duty with Mueller Apartments to inspect and maintain the elevator so that the accident which occurred to Katherine Cash would not happen.

Here the elevator was under the control of both Otis and Mueller Apartments. In the ordinary course of things, the accident would not have happened if due care had been taken by those in control of it; the plaintiff has no means of explaining how the elevator was not at the floor at which the door opened. In that situation, res ipsa applies. Class v. Young Women's Christian Association (1934), 47 Ohio App. 128, 191 N.E. 102; Moohr v. Victoria Investment Company (1927), 144 Wash. 387, 258 P. 43; idem., (1928), 146 Wash. 251, 262 P. 643. Exclusive control is not required in Montana. Brothers v. General Motor Corporation (Mont. 1983), 658 P.2d

1108, 40 St.Rep. 226; Tompkins v. Northwestern Union Trust Company (Mont. 1982), 645 P.2d 402, 39 St.Rep. 845.

The record in this case shows a continuing state of disrepair of the elevator. Not only did the elevator company make its usual maintenance calls, once a month, but in addition it was called out for emergency repairs or maintenance several times during the year preceding the Cash incident. Both the elevator company and the apartment owner knew that the brass hook could be bent by use and had signs posted on the elevator asking users not to "slam" the elevator doors. Res ipsa raises a presumption that negligence on the part of those in control occurred; nothing produced by the defendants, either Mueller Apartments or Otis Elevator Company, in the trial of this case, excluded their negligence as a proximate cause of Cash's injuries, except upon the sheerest speculation of someone slamming the door.

I would affirm the District Court in all respects.

John C. Sheehy
Justice