No. 93-541

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

DOUGLAS J. PIERCE,

      Plaintiff and Appellant,

v.

ALSC ARCHITECTS, P.S., a Washington
Professional Service Corporation,

      Defendant and Respondent.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Michael H. Keedy, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Roger M. Sullivan, McGarvey, Heberling,
Sullivan & McGarvey, Kalispell, Montana

      For Respondent:

            I. James Heckathorn, Murphy, Robinson,
Heckathorn & Phillips, Kalispell, Montana

Submitted on Briefs:  August 12, 1994

Decided:  February 23, 1995

Filed:    FEB 23 1995

FILED

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

                               Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The plaintiff, Douglas J. Pierce, filed a complaint in the District Court for the Eleventh Judicial District in Flathead County in which ALSC Architects, P.S., was named as the defendant. Pierce sought to recover damages for personal injuries which he alleged were caused by the professional negligence of Steven Hindley, one of ALSC's principles. Following trial, the jury returned a verdict in favor of ALSC. Pierce moved for judgment notwithstanding the verdict pursuant to Rule 50(b), M.R.Civ.P., or in the alternative, for a new trial pursuant to Rule 59, M.R.Civ.P. However, due to the District Court's failure to rule on those motions within 45 days, they were deemed denied. Judgment was entered in favor of the defendant. Pierce filed a notice of appeal. We reverse the judgment of the District Court and remand for further proceedings.

The following issues are raised by Pierce's appeal:

1.    Was the defendant negligent as a matter of law?

2.    Was the plaintiff free from contributory negligence as a matter of law?

3.    Is the plaintiff entitled to an order dismissing the defendant's affirmative defense which was based on the accepted work doctrine?

## FACTUAL BACKGROUND

In March 1987, ALSC Architects, P.S., entered into a written agreement with Rosauers Supermarkets, Inc., to provide architectural services related to a remodeling project at Rosauers

2

Supermarket in Kalispell, Montana. In addition to other services, ALSC agreed to act as the owner's representative during the construction phase of the project for the purpose of communicating instructions to the contractor. The architect also agreed to assure that the project progressed in a manner consistent with the contract plans and other documents. Toward that end, ALSC agreed that its representative would periodically visit the site of the construction work and "endeavor to guard the owner against defects and deficiencies in the work of the contractor."

Richard Salsbury is the vice president of Rosauers and acted as the owner's representative for the remodeling project. He is also a licensed architect.

Steven Hindley is a partner in ALSC Architects, and served as ALSC's project architect during the remodeling of Rosauers' Kalispell store.

Stewart and Meredith, Inc., was the contractor which performed the remodeling services on Rosauers' Kalispell store. Roy Beekman was their foreman and construction supervisor for the project.

The store manager's office is located on the second floor of Rosauers' Kalispell store. Prior to the remodeling project, there was a door in the manager's office which provided access to an observation and storage room. The room included a security walkway, windows from which the store could be observed, and areas where surplus material and decorations were stored.

Prior to the remodeling project, the store also had a walk-in cooler located on the main floor immediately below the observation

3

and storage room.  The roof of the cooler was even with the security walkway and provided a floor for the storage room, and a place for storage of seasonal displays used in the store.

During the remodeling project, the large walk-in cooler was removed and replaced with a smaller walk-in freezer.  A suspended ceiling was installed in the space between the new walk-in freezer and the observation walkway.  The plans which led to these changes were developed by Hindley and ALSC.

As part of the remodeling project, closed circuit televisions were installed, and the walkway and observation windows were no longer necessary.  The observation room was redesigned as a security room which housed the closed circuit televisions.

As a result of these changes, Salsbury discussed with Hindley the options of developing the walkway as accessible space, or abandoning it and sealing it off.  They agreed that if it was going to be accessible, in order to make it safe and satisfy the requirements of the Uniform Building Code, it would be necessary that they install guardrails in the area of the drop ceiling, provide lighting, and improve the walkway surface.  However, they agreed that it would not be necessary to use the space, and therefore, to seal off access to the drop ceiling by removing the access door, covering the opening with drywall, and moving the access door to another location in the store manager's office to provide access to the new security room.

The first step toward accomplishing the changes agreed upon was the preparation of a change order which illustrated the

relocation of the access door. The contractor agreed to make the change for the amount of $1647, which was in fact paid by Rosauers to the contractor. However, the change was never made.

Roy Beekman testified that when he did the work on the security room, he had an extra door, and that rather than relocate the door from the storage area, he simply left it in place and used the extra door for the new security room. Beekman testified that he did not have Salsbury's authorization to leave the storage area access door in place, but that he did discuss it with Hindley. He was not advised by Hindley that Salsbury wanted to abandon the space and that the door was supposed to be removed; nor was he advised that if the door was going to remain, a guardrail would have to be installed, and lighting and an improved walking surface would have to be provided. He was aware that the access door had been used in the past and assumed it would be used in the future.

Hindley recalled a discussion with Salsbury during which removal of the access door was discussed. Pursuant to that discussion, on November 18, 1987, he prepared a change order which required that the access to the storage area be sealed off with sheetrock. During a subsequent visit to the store for inspection, he became aware that the removal of the door, as required by that change order, had not been accomplished, but did not inform Salsbury that the door had been left in place. In fact, prior to final payment by Rosauers to the contractor, Hindley conveyed drawings to Salsbury which indicated that the removal of the access

5

door, as required by the November 18, 1987, change order, had in fact been accomplished.

Doug Pierce was working as a stock clerk at Rosauers on May 21, 1988, when a customer asked to borrow some of the store's Hawaiian Day posters. Pierce conveyed the request to his supervisor, Lynn Sterling, who approved the request and advised Pierce that the posters would either be located in the new security room or the old storage area.

Prior to that date, Pierce's duties required that he occasionally visit the storeroom to retrieve store decorations. He estimated that he had been there once or twice a year and at least a dozen times altogether. He testified that the door to the store manager's office was normally open and that to recover the displays he would normally enter the storage area through the access door; proceed down a walkway for several feet; make a turn to the left; and then step down on the roof of the freezer where items were often stored, or from where access could be gained to another area where items were stored. There was a light switch accessible from the roof of the freezer which illuminated the storage area.

On the date of his accident, Pierce opened the door to the storage area, noticed there was no light switch in the area of the doorway, and proceeded down the walkway. He turned to his left to step down on what he thought would be the freezer, but instead, stepped onto the drop ceiling and crashed to the floor ten feet below. As a result of his fall, Pierce sustained serious physical injuries.

6

Although Pierce had often entered the storage area prior to the remodeling project, the date of his injury was the first occasion he had to enter that area after the remodeling project was completed. He stated that there was nothing different about the appearance of the access door on the date of his accident. Neither did the plywood walkway look any different, and because there was no light in the area, there was no way to tell that a drop ceiling had been substituted for the former walk-in cooler. No warning had been placed outside the door and there was no lock on the door.

Sterling is the grocery department manager at the Kalispell Rosauers and was Pierce's supervisor on the date of his injury. He was the one who advised Pierce that the decorations were most likely in the storage room behind the manager's office because that is where they had been located in the past. Sterling testified that he had entered the storage area himself as often as six times a year prior to the remodeling project and he presumed it was still okay to use the storage area because the door was still there. He expressed his surprise at learning of Pierce's fall. He explained, "The door was still there, I mean, it could have been me."

On September 8, 1989, Pierce filed this complaint against ALSC based on his allegation that Hindley negligently failed to guard against the inherent danger presented by the suspended ceiling by failing to warn of the hazard, provide adequate lighting in the area, or provide a guardrail. ALSC answered by denying negligence, and alleged as affirmative defenses that Pierce was contributorily

7

negligent and that his claim was barred by the accepted work doctrine.

Prior to trial, ALSC moved for summary judgment on the basis that, since the remodeling project was substantially complete by January 15, 1988, and Pierce's injury did not occur until May 21, 1988, his claim was barred by the accepted work doctrine.

Pierce also moved for an order striking ALSC's affirmative defense based on the accepted work doctrine, and holding that ALSC was negligent as a matter of law based on violations of the Uniform Building Code.

Both motions were denied. With regard to the accepted work doctrine, the District Court held that there were issues of fact related to whether the work was actually complete at the time of Pierce's injury, and whether the defect, if any, was hidden. With regard to the Uniform Building Code, the District Court held that there were factual issues about whether the code had been violated, and furthermore, that violations were only evidence of negligence.

A jury trial commenced on October 28, 1991, and on November 1 the jury returned its verdict that ALSC was not negligent.

Prior to the jury's deliberations, it was instructed that an architect is not liable to third parties for injuries which occur after work has been completed and accepted by the owner for whom the work was done. It was also instructed that a violation of the Uniform Building Code is negligence per se.

On November 7, 1991, Pierce moved for judgment notwithstanding the verdict, or in the alternative, for a new trial. On

January 17, 1992, the District Court issued an order granting judgment notwithstanding the verdict on the issue of ALSC's negligence, and ordered a retrial of the remaining issues. However, we held in *Pierce v. ALSC Architects* (1993), 259 Mont. 379, 856 P.2d 969, that because the District Court's order had not been entered within 45 days after Pierce's motion, the motion had been denied by operation by law pursuant to Rule 59, M.R.Civ.P. We also held that because of this case's unique procedural history, the plaintiff was not to blame for previously withdrawing his notice of appeal, and the plaintiff would have an additional 30 days within which to file a notice of appeal after the case was remanded to the District Court.

After remittitur was received by the District Court, judgment was entered for ALSC and a notice of appeal was filed by Pierce.

### ISSUE 1

Was the defendant negligent as a matter of law?

The standard of review of a denial of a motion for judgment notwithstanding the verdict made pursuant to Rule 50(b), M.R.Civ.P.,

> is the same as that for review of a motion for a directed verdict, and . . . may be granted only when it appears as a matter of law that the non-moving party could not recover upon any view of the evidence, including the legitimate inferences to be drawn from it.

*Hash v. State* (1991), 247 Mont. 497, 500, 807 P.2d 1363, 1365 (citing *Wilkerson v. School District No. 15, Glacier County* (1985), 216 Mont. 203, 211, 700 P.2d 617, 622).

9

Pierce argues that there was insufficient evidence to support the jury's verdict because, based on the undisputed evidence, ALSC violated the Uniform Building Code, and therefore, was negligent as a matter of law.

In *Herbst v. Miller* (1992), 252 Mont. 503, 830 P.2d 1268, we held that when the Uniform Building Code is adopted by local ordinance, failure to comply with the U.B.C. is a violation of a city ordinance, and therefore, is negligent per se. It is undisputed that on March 17, 1986, the City of Kalispell adopted the 1985 edition of the Uniform Building Code as Kalispell City Ordinance No. 1078 and that the provisions of the code were in effect at the time that Hindley's services were performed on the Rosauers remodeling project, and were applicable to that project. The provisions of the code upon which Pierce relies are the following:

> **Sec. 104. . . . .**
>
> (b) **Additions, Alterations or Repairs.** Additions, alterations or repairs may be made to any building or structure without requiring the existing building or structure to comply with all the requirements of this code, provided the addition, alteration or repair conforms to that required for a new building or structure. Additions or alterations shall not be made to an existing building or structure which will cause the existing building or structure to be in violation of any of the provisions of this code <u>nor shall such additions or alterations cause the existing building or structure to become unsafe.</u> An unsafe condition shall be deemed to have been created if an addition or alteration will cause the existing building or structure to become structurally unsafe or overloaded . . . or will otherwise create conditions dangerous to human life.
>
> . . . .

**Guardrails**

> **Sec. 1711.** All unenclosed floor and roof openings
> . . . which are more than 30 inches above grade or floor
> below . . . shall be protected by a guardrail.
> Guardrails shall not be less than 42 inches in height.

U.B.C. §§ 104(b) and 1711 (1985) (emphasis added).

Salsbury, who is himself an architect, testified that he first learned that the access door, which we have discussed, had not been removed, and that access to the storage area had not been sealed off, when he learned of Pierce's injury. He also testified that it had been Hindley's responsibility as the project architect to assure that the door was removed in conformity with the project specifications, or to advise the owner of the contractor's failure to do so. He testified that, because of the changes made during the remodeling project, the door to the storage room provided access to a hazard which had not previously existed, and that Pierce was injured because of a condition inside the storage area which was "unsafe to human life" in violation of U.B.C. § 104(b) (1985). He agreed that if the area was accessible following the remodeling project, guardrails were necessary pursuant to U.B.C. § 1711 (1985), and that lighting and an improved walkway would also have to have been added to comply with acceptable architectural standards.

In sum, Salsbury conceded that at the time of Pierce's injury the area where he was injured did not conform to the requirements of the Uniform Building Code and that those requirements were only minimum standards.

11

Pierce also called Clark Llewellyn as a witness. Llewellyn is a professor of architecture at Montana State University and practices architecture in the Three Forks area. Based on his review of the accident scene and the relevant standards, he concluded that the U.B.C. was applicable and that it required that the access door to the storage area either be removed and the opening sealed, or in the alternative, that the storage area be brought up to code by the installation of an improved walkway, lighting, and guardrails. He described the ceiling area through which Pierce fell as a hidden defect which cannot be seen until a person is on top of it.

He testified that if a door is provided to an area and access allowed, an architect cannot assume that the area will not be used, and that if the area is accessible, then the Uniform Building Code is applicable. In response to cross-examination by ALSC's attorney, he specifically denied that the U.B.C. is only applicable if the owner expresses an intention to use the area.

The only witness called by ALSC to controvert the testimony of Salsbury and Llewellyn was Hindley. He agreed that based on removal of the walk-in cooler and changes made during the remodeling project, the area behind the store manager's office, which had formerly been used for storage, was no longer safe for use without the installation of lighting, an improved walking surface, and guardrails. He also agreed that it was his duty to assure the store owner that the contractor's performance conformed

12

to the contract documents, and that the change order requiring removal of the storage room access door was one of those documents.

However, Hindley contended that because he had been told the storage room would not be used, it was neither necessary to make improvements inside the area, nor eliminate access to the area. He admitted that if the area was going to be used, it was in violation of the U.B.C. requirements, but did nothing to assure that it would not be used. He also acknowledged that because the door was allowed to remain, it would not have been apparent to Doug Pierce, Lynn Sterling, or any other employee, that the room had no obvious use.

During an inspection of the building in January 1989 following Pierce's accident, when Hindley observed that the room was still being used for storage, he recommended that a lock and hasp be installed to prevent access to the area.

We conclude, after a thorough review of the trial court record, that there was not substantial evidence to support the jury's verdict, and that the uncontroverted evidence established that ALSC's performance related to the remodeling project of Rosauers in Kalispell, violated §§ 104(b) and 1711 of the 1985 edition of the Uniform Building Code.

The area through which Pierce fell was clearly an unenclosed floor opening which was more than 30 inches above the floor below, and was unprotected by a guardrail. There is no exception provided in § 1711 based on an architect's belief that the area will not be used, or will only be used infrequently. Furthermore, the record

13

establishes that when Hindley certified that the contractor's performance was complete, the access door remained as it had always been with no warning of the hazard to which it provided access, and no lock with which to preclude access. It was unreasonable to presume that employees who had frequently used this area in the past would not continue to do so in the future, absent any preventative or protective measures.

We conclude that the second floor storage area which had been frequently used by employees in the past, but which, because of remodeling alterations, now included of a false floor ten feet above the floor below, and which was without any form of lighting, was an "unsafe condition . . . dangerous to human life" in violation of U.B.C. § 104(b) (1985).

Hindley admitted that, if used in its altered condition, the storage room was unsafe. Yet, he did nothing to assure that it would not be used, nor did he warn potential users of the hazard which existed. As Professor Llewellyn pointed out, when a functional door is provided, future use has to be presumed.

The fact that Salsbury advised Hindley that the door could be removed and the entryway sealed because future use was not planned cannot now serve as the excuse for failure to either make the area safe, or to prevent access by those who were unaware of the danger that it posed.

For these reasons, we conclude that ALSC was negligent as a matter of law and the District Court erred when, due to the passage

14

of time, Pierce's motion for a judgment notwithstanding the verdict was deemed denied.

## ISSUE 2

Was the plaintiff free from contributory negligence as a matter of law?

Pierce contends that based on the evidence set forth above, he was entitled to a directed verdict dismissing ALSC's affirmative defense of contributory negligence. Pierce contends that based on our decision in *Green v. Hagele* (1979), 182 Mont. 155, 595 P.2d 1159, he had a right to assume that others would act with reasonable care and was not negligent for failing to anticipate an injury that could only have resulted from another's negligence.

ALSC responds that Pierce entered a dark room without using a flashlight or otherwise attempting to see where he was going, and if he had paid attention, he would have noted changes in the storage area which would have alerted him to the possibility of danger. ALSC also contends that Pierce was aware that the walk-in cooler had been removed prior to the date of his accident, and that he should have associated the cooler's removal with the changed condition of the floor in the storage area.

We have held that a motion for a directed verdict is proper only in the complete absence of any evidence which would justify submitting an issue to the jury, and all inferences which can be drawn from evidence must be considered in the light most favorable to the opposing party. *Jacques v. Montana National Guard* (1982), 199 Mont.

15

493, 649 P.2d 1319. We have also held that even when a defendant is negligent as a matter of law, the issue of contributory negligence on the part of the plaintiff and the degree of comparative negligence, if any, is normally an issue for the jury or fact finder to resolve. *Okland v. Wolf* (1993), 258 Mont. 35, 850 P.2d 302.

Based on our review of the record, we conclude that construing all inferences from the evidence in a manner most favorable to the defendant, there was sufficient evidence to submit the issue of contributory negligence to the jury, and we conclude that the District Court did not err when it refused to dismiss ALSC's affirmative defense of contributory negligence.

<u>ISSUE 3</u>

Is the plaintiff entitled to an order dismissing the defendant's affirmative defense which was based on the accepted work doctrine?

Pierce contends that he was entitled to summary judgment dismissing ALSC's affirmative defense based on the accepted work doctrine. We review a district court's disposition of motions for summary judgment *de novo*. *Spain-Morrow Ranch, Inc. v. West* (1994), 264 Mont. 441, 444, 872 P.2d 330, 331 (citing *Minnie v. City of Roundup* (1993), 257 Mont. 429, 431, 849 P.2d 212, 214). Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; *Spain-Morrow*, 872 P.2d at 331-32.

16

Pierce contends that he was entitled to summary judgment on this issue for several reasons. First, he contends that ALSC assumed the duty to assure that the remodeling project was done in a safe manner and that, pursuant to our decision in *Stepanek v. Kober Construction* (1981), 191 Mont. 430, 625 P.2d 51, that duty was nondelegable, but that the accepted work doctrine would permit delegation of that duty.

Second, Pierce contends that we should follow the lead of the Supreme Court of Arizona and conclude that the accepted work doctrine applies only to contractors, and not to architects. *See L. H. Bell & Assoc., Inc. v. Granger* (Ariz. 1975), 543 P.2d 428.

Third, Pierce contends that based on the undisputed facts in this case, there was insufficient evidence to justify instructing the jury on this defense because the construction project was not complete at the time of Pierce's injury and the defect which caused his injury was hidden.

Finally, Pierce contends that the accepted work doctrine is inconsistent with the principles of modern tort law and should no longer be followed. Because we agree, we will not address the previous issues, but conclude that the District Court erred when it denied Pierce's motion to dismiss ALSC's affirmative defense based on the accepted work doctrine.

The accepted work doctrine was first discussed, although not applied, in *Ulmen v. Schwieger* (1932), 92 Mont. 331, 12 P.2d 856. However, in that case, the doctrine was not discussed in the

17

context of relieving a contractor of liability, but rather, for the purpose of imposing liability on a subcontractor who worked on a highway construction project during that period of time when the subcontractor was actually in control of the premises. We held that the cases cited in support of this doctrine

> are of that class wherein an owner or contractor employs an independent contractor to work upon premises the possession of, and control over, which is surrendered to him, and consequently the independent contractor is not relieved of responsibility until his work has been accepted and the premises revert to the control of the owner or original contractor.

*Ulmen*, 12 P.2d at 862.

We held that in that case the general contractor had never surrendered control of the project, and therefore, the subcontractor had never assumed any liability from which to be relieved based on the accepted work doctrine. However, we did not discuss the accepted work doctrine in that case under circumstances where a contractor or a subcontractor was seeking relief from liability for a condition actually created by the contractor's act of negligence.

We affirmed and applied *Ulmen* in *Hannifin v. Cahill-Mooney Construction Co., Inc.* (1972), 159 Mont. 413, 498 P.2d 1214. However, in that case, the contractor from whom damages were sought worked under the direction of the owner of the property regarding the nature and extent of work to be done. We held that where the contractor had left the job and had no control over the premises for some two months and twenty days preceding the accident, that it was the

18

owner of the property, rather than the contractor, who was responsible for maintaining it in a reasonably safe condition. Again, in *Hannifin*, the issue related to maintaining premises in a reasonably safe condition, rather than responsibility for actively creating a hazard through negligent acts or omissions.

We again cited *Ulmen* in *Olson v. Kayser* (1973), 161 Mont. 241, 505 P.2d 394. In that case, the defendant, a plumbing contractor, had done excavation for the installation of a sewer service, which was refilled to the owner's satisfaction, but which subsequently settled naturally. The owner was aware of the fact that the excavated area would subsequently settle, and intended to fill it with gravel. However, before he was able to do so, the plaintiff, a passerby, tripped and fell in the recessed area. We held that since the contractor had committed no act of negligence from the time his job was complete and accepted by the property owner, that he was relieved of liability by the doctrine articulated in *Ulmen*.

Our first occasion to reconsider this defense in the context of modern tort law was our decision in *Harrington v. LaBelle's of Colorado, Inc.* (1988), 235 Mont. 80, 765 P.2d 732. In that case, a department store in Billings was sued by a bicyclist who was injured when he struck a speed bump in the store's parking lot. The property owner filed a third-party complaint against the contractor who installed the speed bump. However, the complaint was dismissed based upon the accepted work doctrine. On appeal from dismissal of its third-party complaint, the property owner asked that we reconsider

that doctrine in light of more contemporary decisions from other jurisdictions which have rejected it. The majority of the court declined to do so. However, Justice Weber, in a dissent joined by Justice Hunt, questioned the rationale for this defense in light of general rules of negligence in Montana. Justice Weber pointed out that:

> Other jurisdictions have held that the principles supporting the rule of contractor nonliability do not mesh with modern theories of negligence. The leading case in which the District of Columbia Circuit refuted these justifications for contractor nonliability is *Hannah v. Fletcher* (D.C.Cir.1956), 231 F.2d 469. The court reasoned that the antiquated justifications based on lack of privity had no place in modern theories of liability as set forth in *MacPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050.
>
> . . . .
>
> This Court has followed *MacPherson* and allowed recovery for negligence asserted against the manufacturers of automobiles [see *Rix v. General Motors Corp.* (Mont. 1986), [222 Mont. 318,] 723 P.2d 195, 43 St.Rep. 1296], and manufacturers of farm machinery [see *Brown v. North American Manufacturing Co.* (1978), 176 Mont. 98, 576 P.2d 711]. We concluded in those cases that it was no longer appropriate to bar recovery on theories such as those identified in connection with the accepted work doctrine, that is a lack of contractual privity, or that there would be excessive litigation, or similar theories. Given our rules of liability in cases where negligent construction by a manufacturer may cause injury, I see no reason why we should not extend that reasoning to apply to negligent construction by a contractor. Certainly the potential for injury due to negligent construction by a contractor is just as great as with the negligent manufacturing of a consumer good.

*Harrington*, 765 P.2d at 735-36 (alterations in original).

Our most recent discussion of this defense is found in *Nichols v. Corntassel* (1993), 258 Mont. 173, 852 P.2d 583. In that case, the

20

majority noted a gradual trend away from nonliability for contractor negligence and observed that, "[a]uthors of the Restatement (Second) of Torts at § 385 recommended that contractors should be placed on the same footing as manufacturers for negligence liability." *Nichols*, 862 P.2d at 585.

The majority also observed that:

> A number of courts have expressed dissatisfaction with the rule, favoring a more direct approach such as that of the Texas court in *Strakos*. 13 Am.Jur.2d *Building and Construction Contracts* § 140 (1964). Instead of applying the nonliability rule, these courts have established a rule that a contractor is liable for injuries to or death of third persons after acceptance by the contractee where the work is reasonably certain to endanger third persons if negligently completed. *Id.* This view adopts a rationale that there are no sufficient grounds to differentiate between liability of a manufacturer of goods and that of a building or construction contractor. *Id.* The building contractor's liability under this reasoning is not absolute, but predicated upon negligence. Thus, a contractor following plans or specifications given to him will not be liable if a reasonable person would have followed them. *Id. See, e.g., Menendez v. Paddock Pool Const. Co.* (Ariz.App.1991), 836 P.2d 968 (nonliability rule applies only when contractor has no discretion and is merely following plans and specifications provided by the employer); and *Hannah v. Fletcher* (D.C.Cir.1956), 231 F.2d 469 (the leading case rejecting the "accepted work" doctrine).

*Nichols*, 852 P.2d at 585.

However, after a review of the record in *Nichols*, the majority concluded that there was an insufficient factual record with which to apply the doctrine or its exceptions, and therefore, reversed summary judgment in favor of defendant and remanded that case to the district court for further development of the record. Justice Trieweiler, however, in a dissent joined by Justice Hunt, stated

21

that the doctrine had no place among modern theories of liability and stated that the defense should no longer be applied in Montana.

We are now squarely faced with the issue which we declined to consider in *Nichols*, and upon further consideration, conclude that the accepted work doctrine should no longer be followed in Montana.

This defense, as previously applied, has the undesirable effect of shifting responsibility for negligent acts or omissions from the negligent party to an innocent person who paid for the negligent party's services. Furthermore, the shifting of responsibility is based on the legal fiction that by accepting a contractor's work, the owner of property fully appreciates the nature of any defect or dangerous condition and assumes responsibility for it. In reality, the opposite is usually true. Contractors, whether they be building contractors, or architects, are hired for their expertise and knowledge. The reason they are paid for their services is that the average property owner does not have sufficient knowledge or expertise to design or construct real property improvements safely and soundly. The mere fact that expert testimony is required to establish professional negligence makes it clear that nonexperts are incapable of recognizing substandard performance on their own. How then can we logically conclude that simply because the professional has completed his or her services and the contractee has paid for those services, liability for the contractor's negligence should shift to the innocent and uninformed contractee? We cannot. That is why the

22

Supreme Court for the State of Texas held in *Strakos v. Gehring* (Tex. 1962), 360 S.W.2d 787, 791, that elimination of the accepted work doctrine would restore logic and simplicity to the law of liability.

We conclude that, for the reasons first noted in Justice Weber's dissent to the opinion in *Harrington*, for those further reasons set forth, but not applied, by the majority in *Nichols*, and for the additional reasons set forth in this opinion, elimination of the accepted work doctrine is more consistent with modern principles of tort liability and is more likely to place liability for negligent conduct on the appropriate party. To the extent that prior opinions discussed herein are inconsistent with this conclusion, they are reversed.

Therefore, we conclude that the District Court erred when it denied Pierce's motion to dismiss that defense by summary judgment, and the District Court erred when it instructed the jury that the accepted work doctrine was a defense to Pierce's claim.

We reverse the judgment for ALSC. We remand this case to the District Court for entry of judgment in favor of Pierce on the issue of ALSC's negligence, and for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

23

John Conway Harrison
_____

William E Hunt
_____

_____
Justices

Justice Fred J. Weber dissents as follows:

I concur in the majority opinion on Issues II and III and dissent from Issue I of the majority's opinion. I do not agree with the conclusion that § 104(b) of the Uniform Building Code (UBC) applies to establish negligence per se in this case and the conclusion that negligence was established as a matter of law. Section 104(b) of the UBC provides in pertinent part:

> Additions or alterations shall not be made to an existing building or structure which will cause the existing building or structure to be in violation of any of the provisions of this code nor shall such additions or alterations cause the existing building or structure to become unsafe. An unsafe condition shall be deemed to have been created if an addition or alteration will cause the existing building or structure to become structurally unsafe or overloaded . . . or will otherwise create conditions dangerous to human life.

Section 1711, provides:

> All unenclosed floor and roof openings, open and glazed sides of landings and ramps, balconies or porches, which are more than 30" above grade or floor below, and roofs used for other than service of the building shall be protected by a guardrail. . . .

I do not agree that § 1711 mandates that the area where Pierce fell through the ceiling tile to the floor below was an area for which a guardrail was required according to the UBC. Nor do I agree with the majority's conclusion that, as a matter of law, a condition was created that was dangerous to human life.

The question whether ALSC violated the UBC was presented to the jury by means of the following instruction:

> Kalispell City Ordinance No. 1078, adopted as law the 1985 edition of the [UBC]. If you find that the defendant violated any provision of the [UBC] relating to human safety, such violation is negligence. You should then determine whether that negligence was a cause of the

25

plaintiff's injury.

According to this instruction, the jury could find that ALSC violated the UBC and, in that event, negligence is established. The court refused to instruct the jury that ALSC was negligent as a matter of law, leaving the question of whether ALSC violated the UBC--and, therefore, was negligent--to be determined by the jury pursuant to expert testimony presented at trial. The jury heard the evidence presented by the experts and had the opportunity to observe the witnesses and determine their credibility firsthand.

The District Court correctly presented the question whether the UBC was violated to the jury. The jury listened to the evidence presented and determined that there was no violation of the UBC. The evidence on this issue consisted of expert testimony from architects Hindley, Salsbury and Llewellyn. Whether the UBC had been violated was properly a question to be determined by the trier of fact based on expert testimony.

Some of that expert testimony, as emphasized in the majority opinion, was presented by the plaintiff's expert, Professor Clark Llewellyn. Llewellyn was the only architect who testified unequivocally that the area where Pierce fell through had to be brought up to code by installing a new walking surface, lighting and guardrails even if it was not going to be used and even if the owner insisted upon leaving the area accessible without improvements. There was testimony from the other architects that such an area is up to code without improvements if no use is planned for the area.

Architect Hindley testified that the use to be made of a room determines how the UBC requirements for improvements are to be applied, specifically stating that "it is up to code if it's not being used." He testified that his understanding was that the use of that space was to be discontinued and that people would not be allowed in the space. He considered it as dead ceiling space, which does not require improvement. After he learned that the store manager and Roy Beekman agreed to leave the door in place and that access was possible to the area, he was assured again that the area was not going to be used for any purpose. Based upon that assurance, he determined that the space did not require improvement nor did it need to be closed in by sheetrock.

The plan to close off the space was part of a change order primarily intended to provide access to the new security room. Sealing off the access by sheetrocking over the door opening was planned so that the door could be used for the new security room. Hindley and Salsbury agreed to move the door to the new security room in order to save on costs. They agreed that if the area where Pierce later fell through was going to be used by Rosauer's, it would need improvements, including a guardrail, in order to conform to the UBC. Salsbury assured Hindley that the area was not going to be used for any purpose. Removal of the door was never a main concern; it was planned in order to provide access to the new room, not primarily to conform to the UBC. Based on Salsbury's decision to abandon any use of the area, Hindley did not insist on closing off the space with sheetrock when he learned that, instead of

27

closing off the room, a new door was provided by the contractor for the new room at no extra cost to Rosauer's.

Richard Salsbury, owner-representative for Rosauer's and an architect himself, testified extensively about the requirements for the abandoned area. As emphasized by the majority, some of his testimony was to the effect that the area did not conform to the UBC. However, his testimony equivocated--he also testified that the space was like attic space and did not need improvements unless it was going to be used. He told Hindley that Rosauer's intended to abandon the area. Salsbury did not concede, as the majority opinion states, that the area where Pierce was injured did not conform to the UBC. What Salsbury agreed to was the statement that if the area were to be used by humans for any purpose, it did not conform to the UBC. He testified that he thought Hindley had violated the regulations of the AIA (American Institute of Architects), a professional organization for architects. Violation of an AIA regulation or ideal of conduct does not have the same significance as a violation of the UBC. The UBC is a set of minimum standards adopted as a city ordinance by the City of Kalispell.

Salsbury also testified that the area was to be abandoned. He testified that unused attic space, even if there is an access door to it, does not require sealing off access to comply with the UBC. He further testified that, although there is no UBC requirement that a space has to be sealed off or improved, he decided, at the time of his initial discussion with Hindley about the space, that

it be sealed off because it was going to be abandoned and not used for any purpose. Instead of closing the area by means of sheetrocking over it, the door could have been nailed shut or kept locked to prohibit access. Salsbury testified that Hindley was justified under the circumstances in accepting his statement that it would not be used. Furthermore, if Rosauer's had not decided to have a security room built at the last stages of the project, the area would have been left as it was with no improvements. This area was only accessible by going through the manager's office.

According to the testimony as discussed above, there was an actual dispute among the architects as to whether the facts demonstrated a violation of the UBC. Llewellyn testified that access to the area had to be closed off even if usage for any purpose was to be abandoned. Hindley testified that the UBC required that it be closed off or improved only if there was an intent to use the space. Salsbury's testimony on direct examination was that the UBC was violated if the area was to be used; on cross-examination he testified the area was like unused attic space which did not need improvements. All three architects agreed that the area had to be improved to conform to the UBC if it was going to be used; only Llewellyn testified unequivocally that the area here did not conform to the UBC requirements even if all use was abandoned. Although Salsbury testified that if he had known the door was left in place, he would have insisted it be locked or otherwise closed off, he did not testify that it did not conform to UBC standards. His testimony was that it did not comply

29

with AIA standards, which are different from and more exacting that the minimal requirements of the UBC.

We have held in numerous cases that expert testimony is required in order to establish the standard of care for professionals because such standards of care are outside the common experience and knowledge of lay jurors and expert testimony is required to assist them in resolving professional negligence cases. That requirement has been extended to negligence actions in Montana against veterinarians, medical doctors, lawyers, dentists, orthodontists, manufacturers of pharmaceuticals, and abstractors of title. Zimmerman v. Robertson (1993), 259 Mont. 105, 107, 854 P.2d 338, 339. Most recently, we held that expert testimony was required to establish the standard of care of professional counselors. See Newville v. Department of Family Services (Mont. 1994), 883 P.2d 793, 805, 51 St.Rep. 758, 767-68. Architects are included in the group of professional fields requiring expert testimony to establish the standard of care. See Prosser and Keeton, The Law of Torts, § 32 (5th ed. 1984); Zimmerman, 854 P.2d at 339.

After admitting evidence of expert testimony to assist the lay jurors in this case in making their determination on the issue of the professional architect's negligence, the District Court submitted the issue of ALSC's negligence to the jury. The majority has disregarded that expert testimony from architects Hindley and Salsbury and has concluded that there was not substantial evidence to support the jury's verdict and that the uncontroverted evidence

30

established that ALSC's performance of the Rosauer's contract violated §§ 104(b) and 1711 of the 1985 edition of the Uniform Building Code. I emphasize that the evidence was not uncontroverted and there was substantial evidence from which the jury could determine either that the UBC was violated or that the UBC was not violated. The majority has usurped the jury's role and made that determination as a matter of law. Even assuming that Hindley's testimony was self-serving, however, that does not explain the following expert testimony from Salsbury, which I conclude constitutes substantial evidence that the UBC was not violated:

> Q [by Mr. Sullivan] Would the improvements of lighting and guard rail have been required under the Uniform Building Code if the area accessed by the door, which was left, was going to be continued to be used for any purposes?
>
> A Yes.

Salsbury testified that an area not used did not have to conform to the UBC requirement for a guardrail and likened the space to unused attic space. His testimony was as follows:

> Q [by Mr. Heckathorn] And if attic or if an attic space is going to be abandoned, and not used, there is no requirement, under the [UBC] to do something with the attic, is there?
>
> A No.
>
> Q And there is no problem, even if you have an access door to that unused space, you still don't have to do anything to it, do you?
>
> A No.
>
> Q If you don't use it?
>
> A That is true.
>
> Q But, what does the [UBC] say as to when something like

31

that attic space must be developed and --

A    When there is a use?

Q    Well, what kind of a use?

A    Use by humans.

        . . . .

Q    . . . Under the facts that you have given us, that you had told Steve that the attic space was going to be abandoned, you don't contend that there was some duty on the part of Steve to do something to comply with the [UBC], do you?

A    I do not, as long as the space was sealed off.

Q    Yeah.  Well, no -- As long as you had told him that it was going to be abandoned and not used?

A    Well, the alternatives that I discussed with Steve were that we either had to improve that area where the accident happened, so that it would be safe, or that we would have to seal it off.

Q    I think that Steve asked you, did he not, whether you would like to have that developed for storage?

A    Yes, that's true.

Q    And you told him that you would not, that you were going to abandon it?

A    That's true.

Q    Now, the [UBC] does not require, and I think that we have already said that, does not require work to be done in an unused attic space, even if there is an access door to it?

A    That's true.

Q    And so, it isn't a requirement that it be sealed off?

A    That was my decision, however, and direction.

Q    That was by direction of the UBC now?

A    Yes.

Q    There is no UBC requirement that a space has to be sealed off, and if it isn't sealed off it has to have work done on it?

32

A    That's true.

Q    And the only knowledge that Steve had again, was that you had said it was going to be abandoned?

A    Yes.

Q    And not used?

A    Not used.

Q    And he was justified under those circumstances in accepting your statement that it wouldn't be used?

A    That's true.

    .   .   .   .

Q [by Mr. Heckathorn]    Now, Mr. Salsbury, we saw a lot of exhibits about the AIA and a lot of requirements and those are some of the requirements and there are a lot more, aren't there?  I mean there is a lot of requirements on an architect, you have a lot of professional responsibilities and you go to school for a long time to learn them, don't you?

A    Yes, that's true.

Q    What relevance, or what did you think that all of these exhibits had to do with the issues that we have defined?

A    Well, my thinking is that these exhibits define roles, define paths of communication, define authorities and obligations.

Q    Do you think that Steve violated any of those ideals, regulation of AIA in this contract?

A    Of the AIA?

Q    Yes.

A    Yes.

The requirement of the AIA which Salsbury thought Hindley violated was the failure to recognize that there was a contract requirement that had not been completed--removing the door and sealing off the opening.  That requirement was one which the contractor and the store manager agreed should be left as is with

33

the contractor providing a new door for the security room for the same price. Violation of the AIA is not equivalent to violation of the UBC.

The majority has concluded that there was not substantial evidence to support the jury's verdict and that uncontroverted evidence established that ALSC's performance related to the remodeling project violated §§ 104(b) and 1711 of the UBC. I do not agree that the evidence was uncontroverted and I do not agree that ALSC's performance violated the UBC sections. Moreover, there was substantial evidence to support the jury's finding of no negligence on ALSC's part.

Our role is not to reweigh the evidence when there is substantial evidence to support the jury verdict. This is not the sort of unenclosed floor opening contemplated by § 1711 which needed to be protected by a guardrail. It was an abandoned space accessible only through the manager's office which Hindley and Salsbury testified did not need improvement according to the UBC. Clearly this is substantial evidence to controvert other testimony provided by Llewellyn.

In addition, I do not agree that this was an unsafe condition according to § 104(b). This was an unused area and, as such, needed no improvements, according to the testimony of Salsbury and Hindley. The testimony indicated that there were many changes within the area, including the installation of conduit and other ductwork which to some extent blocked access to the area where the cooler had previously provided the floor and that this should have

34

alerted Pierce to changes within the space. Although the access door remained where it had always been, the area inside the space behind the door was substantially changed. I do not agree with the statement of the majority that "when a functional door is provided, future use has to be presumed."

Because of the conflicts in the evidence, I conclude the District Court properly submitted the issue of architectural negligence to the jury. I further conclude there clearly was substantial evidence presented upon which the jury could base its finding that ALSC was not negligent.

I would affirm the District Court on this issue.

_____
Justice

Justice Karla M. Gray, specially concurring.

I concur in the Court's opinion in all regards and specially concur here on issue 1 in order to respond to the dissent's presentation of Mr. Salsbury's testimony in this case.

Issue 1 is whether defendant was negligent as a matter of law by virtue of its violation of the Uniform Building Code. The Court recounts the clear and uncontroverted evidence--including that of Mr. Salsbury--that the UBC was violated and determines, on that basis, that the District Court erred in not granting plaintiff's motion for judgment notwithstanding the verdict. The dissent presents a picture of Mr. Salsbury's testimony suggesting that Mr. Salsbury equivocated and, thus, created a jury question regarding whether the UBC was violated. Because it is my view that the dissent takes the Salsbury testimony out of the context which is relevant here, I set forth Mr. Salsbury's unequivocal testimony that the altered portion of the store at issue here violated the UBC:

> Q    At the time that Doug was injured, did the area accessed through the door, off of the store manager's office, and in particular the area where Doug Pierce fell through the suspended ceiling, conform to the minimum safety standards of the Uniform Building Code?
>
> A    No.
>
> Q    If the door would have been removed and the opening patched over with sheet rock and studs, as was called for in the clarification drawing R17, would the building at that point have conformed to the provisions of the Uniform Building Code?
>
> A    I believe that it would, that space would have been made non-accessible.

36

. . . .

Q    Do you consider this door, in and of itself, to be a hazard, Mr. Salsbury, or does it gain access to a hazard?

A    It gains access to a hazard.

Q    So the real -- Let me ask you this, did the same hazard exist that claimed Mr. Pierce as its first victim prior to the remodelling project?

A    No.

Q    As the owner's representative, what is the owner's attitude as to that door being left there?

A    We preferred that it be sealed off.

Q    Because it creates a dangerous situation?

A    Yes.

. . . .

Q    The real part of this case, Mr. Salsbury, would you agree, is that there was a condition inside of this storage area which was unsafe to human life at the time that Mr. Pierce was using that space and at the time that he was injured on May 21, 1988?

A    Yes.

. . . .

Q    Let's assume for a minute that under section 104(B) that leaving the door here as it was at the time of the accident, unlocked, no warning signs, no warning signs inside the area, no barricade around the area, but as it existed at the time of the accident, and under section 104(B), did that constitute a condition which was a hazard to human health and safety?

A    Yes, in my opinion it did.

Q    So, in other words, under any of the scenarios that we have discussed, that area, at the time of the accident, had to conform to the minimum requirements of the Uniform Building Code?

A    I believe so, yes.

37

. . . .

Q    In other words, the real hazard that this whole lawsuit is about isn't simply the fact that a door was left in the contravention of your order and the contravention of the contract documents, in contravention of the architect's duty, but the real gut of the lawsuit is, is that door allowed access to a hidden hazard that claimed Mr. Pierce as its first victim, correct?

A    Yes.

Nothing in this testimony equivocates on whether the requirements of the UBC were met.  Mr. Salsbury's testimony establishes without question a violation of section 104(b), which prohibits alterations to an existing building from causing the building to become unsafe or dangerous to human life.

_____
                Justice


Justice James C. Nelson:

I join in the special concurring opinion of Justice Gray.

_____
                Justice


38